## STATE EX REL. EATON v. HIRST, COUNTY TREASURER (OMAHA NATIONAL BANK, ET AL., INTERVENERS)

(No. 2047; May 25, 1938; 79 Pac. (2d) 489)

164

For the plaintiff and appellant, there was a brief and oral argument by *William O. Wilson* of Cheyenne.

For the defendant and respondents and interveners, there was a brief and oral argument by *John U. Loomis* of Cheyenne, Wyoming, and *Arthur R. Wells* of Omaha, Nebraska.

172

RINER, Justice.

This is a proceeding by direct appeal to review a judgment of the district court of Laramie County denying an application made by Irene P. Eaton for a peremptory writ of mandamus directed to the Treasurer of Laramie County, Wyoming, requiring him to issue a tax deed for certain real property situated in said county and theretofore sold by him for the non-payment of taxes. Subsequently herein the applicant aforesaid will generally be referred to as the "relator" or simply as "Mrs. Eaton." Edward W. Hirst is the present Treasurer of the county mentioned, being substituted for Ira L. Hanna, who was his predecessor in that office and the original defendant in the case. The Omaha National Bank, Trustee, The Omaha National Bank and C. B. Atzen came into the litigation subse-

quently as interveners upon due application and court order made therefor.

The facts established by the record and material to be considered are not particularly complicated and would appear to be these: In 1925 the Maple Grove Land & Livestock Company, hereinafter usually designated as the "owner" or the "Livestock Company," was a corporation organized and existing under the laws of the State of Nebraska, which at that time and until at least the year 1935 had complied with the laws of this State relative to foreign corporations and as such was authorized to transact business in Wyoming. It was the owner of certain real estate located in both Laramie and Goshen Counties. In the year first above mentioned the Livestock Company issued at Omaha, Nebraska, certain negotiable bonds in the sum of $70,000, and to secure their payment executed at that place a mortgage whereby it conveyed the property aforesaid to The Omaha Trust Company, as trustee. The company last mentioned was also a Nebraska corporation and also was authorized, by virtue of compliance with our law, as a foreign corporation to transact business in Wyoming during all the times involved in this lawsuit.

In order to raise funds to liquidate the amount then due on the mortgage just described, on November 8, 1930, the owner issued at Omaha, Nebraska, its negotiable bonds in the sum of $66,000, said bonds and their interest coupons being payable at that city. To secure their payment said owner executed and delivered at Omaha, Nebraska, to said The Omaha Trust Company, as trustee, a trust mortgage upon the real estate aforesaid, which was duly recorded in Laramie County, Wyoming, on December 1, 1930, and in Goshen County on December 11, 1930. This trust was in due course accepted by The Omaha Trust Company at Omaha, it being legally authorized to exercise all the

powers of trustee under said mortgage. All of the bonds last mentioned were disposed of at Omaha to The Omaha National Company, a Nebraska corporation, whose corporate name is now The Nebraska Bond and Mortgage Company. The purchaser of said bonds then disposed of them to sundry individuals who purchased them in good faith before their maturity, and the proceeds of the sales were used to retire the 1925 bond issue and mortgage already described.

About May 7, 1931, The Omaha Trust Company resigned as trustee at Omaha, Nebraska. Under the terms of the mortgage and with the written consent of the Livestock Company, the intervener, The Omaha National Bank, a corporation duly organized and existing under the Acts of Congress relating to national banks, was appointed successor trustee thereunder, accepted the trust, and is now the duly qualified and acting trustee, the written instruments evidencing these transactions being duly filed for record in the County Clerks' offices of the two counties where the lands affected are situated. The Omaha National Bank was on December 10, 1924, and prior to its acceptance of this trust, legally granted by the Federal Reserve Board "the right to act, when not in contravention of State or local law, as Trustee, Executor, Administrator, Registrar of stocks and bonds, Guardian of estates, Assignee, Receiver, Committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies or other corporations which come into competition with national banks are permitted to act under the laws of the State of Nebraska. The exercise of such rights shall be subject to regulations prescribed by the Federal Reserve Board."

The Omaha National Bank in its individual capacity, and not as trustee, prior to the time the instant suit was begun, purchased about January, 1931, from The Omaha National Company, and now holds, $25,500 of

the bonds secured by the last mortgage above described. The intervener, C. B. Atzen, also became the owner of $1,000 of said bonds on January 29, 1931.

The Livestock Company failed to pay the taxes on the property thus mortgaged for the year 1930 in Laramie County, and in consequence said property was sold at a tax sale held by the then Treasurer of said County on August 7, 1931, to J. W. Howard, and tax sale purchase certificates numbered 1862 and 1863 were issued to him for the sum of $3,233.12. On account of the default of the Livestock Company in payment of the bonds, the interest and taxes on the $66,000 mortgage and bond issue aforesaid, The Omaha National Bank, as trustee, on May 23, 1933, commenced an action in the district court of Laramie County aforesaid to foreclose said mortgage.

On September 12, 1934, Howard assigned these certificates of purchase to relator. On December 22, 1934, acting under authority of an order of the district court of Laramie County made December 22, 1934, in the suit last mentioned, The Omaha National Bank, Trustee, paid to the County Treasurer a sum of money which was sufficient to redeem said property from said tax sale and the operation of said certificates of purchase and to pay certain other amounts at that time due for subsequent delinquent taxes upon the lands involved here and other expenses which had accrued then, said sum being $17,257.74. The money which was thus used was advanced by the individual bondholders, The Omaha National Bank apparently as a large individual holder advancing the most of it for the express purpose of accomplishing the redemption.

On August 1, 8 and 15, 1935, the relator gave notice by advertisement in a newspaper published in Laramie County, Wyoming, of her intention to apply for a tax deed to the property aforesaid on November 18, 1935. August 17, 1935, service of notice to this effect was

made on all parties in possession of the real estate involved. On November 18, 1935, upon presentation of her application for a tax deed, with the other documents accompanying it and the necessary fee, to the County Treasurer, he declined to issue such a deed relative to the property involved to relator, assigning as his reason that this real estate had been redeemed on December 22, 1934, and relator notified by him to that effect on that date, and that the redemption money paid was being held by him to be turned over to her upon the due surrender of the two certificates numbered 1862 and 1863 already mentioned. December 7, 1935, Mrs. Eaton brought the suit whose record is now submitted here for review, to compel the Treasurer to issue to her the tax deed she sought.

Other facts will be subsequently referred to as may be necessary to throw light upon the discussion of the chief question for determination in the case.

Section 5 of Article X of the Wyoming constitution provides:

"No corporation organized under the laws of Wyoming Territory or any other jurisdiction than this state, shall be permitted to transact business in this state until it shall have accepted the constitution of this state and filed such acceptance in accordance with the laws thereof."

Section 28-141 W. R. S., 1931, in its first sentence subsequently repeats the constitutional provision just quoted, and then indicates how such acceptance of that instrument shall be executed, acknowledged, filed, and recorded in the office of the Secretary of State, and the duty of that officer in relation thereto. Section 28-201 W. R. S., 1931, also provides:

"Every incorporated company incorporated under the laws of any foreign state or kingdom or of any state or territory of the United States beyond the limits of this state (excepting insurance companies), and

now or hereafter doing business within this state, shall within thirty days after commencing so to do business, file in the office of the secretary of state, and also file in the office of the register of deeds of the particular county within which it maintains its principal office and place of business, a copy of its charter or certificate of incorporation duly certified and authenticated by the proper authority of such foreign state, kingdom or territory."

There are specific penalties imposed by Sections 28-203 and 28-204 W. R. S., 1931, for failure to comply with the provisions of Section 28-201, supra.

It is conceded that The Omaha National Bank has never complied with the requirements of either the Wyoming Constitution or the State statutes cited above. The relator contends accordingly that the Trustee's failure to comply with the quoted requirements of our State Constitution and the foregoing provisions of the Wyoming statutes disenabled such Trustee to "transact business" in this state so as to have prevented it from redeeming the mortgaged property which passed to tax sale, as recounted above.

The controlling question now requiring solution is simply therefore—Did The Omaha National Bank as trustee under the mortgage described above have the right to redeem the property so incumbered from the tax sale held as aforesaid, and was the County Treasurer of Laramie County acting legally when he accepted the money therefor? If this question should be answered in the affirmative, then it becomes unnecessary to determine the many other points argued in the voluminous briefs submitted by the parties.

Relator directs our attention to two decisions of this court, Gould Land and Cattle Co. v. Rocky Mountain Bell Co., 17 Wyo. 507, 101 Pac. 939, and Interstate Construction Co. v. Lakeview Canal Co., 31 Wyo. 191,

224 Pac. 850. Upon these decisions she particularly relies, quoting extensively from the language used in the opinions filed therein.

In the first case cited, a Nebraska corporation engaged in a general ranch business in this state, sought to recover from a telephone company damages for breach of contract because of its alleged failure to transmit correctly a message over its telephone line from one of its offices in Wyoming to the Western Union Telegraph Company at another point in this state, said message dealing with a shipment of cattle owned by plaintiff. The defense pleaded in bar of the action was that the plaintiff corporation had not executed and filed its acceptance of the Constitution of the State as required by that instrument. This court held that the defense was good and the contract relied on unenforceable. The second case was also one drawing in question the validity of a contract entered into between a Colorado corporation and the Lakeview Canal Company for the enlargement and extension of a canal in Park County, Wyoming. A dispute arose between the parties, the work was terminated, and the foreign corporation sued for an asserted balance due. The same defense was raised as in the Gould case. It was held good and a judgment for the defendant was affirmed. These cases do not aid in solving the problem we now have. The payment of taxes or the redemption from a tax sale was not involved in either case, neither was there a national bank as plaintiff affected under circumstances even faintly resembling the case at bar.

It is suggested on behalf of relator that the national court of final resort has "passed upon our question," in Chattanooga Building & Loan Ass'n. v. Denson, 189 U. S. 408, 23 Sup. Ct. Rep. 630, 47 L. Ed. 870. We hardly think that is so. In that case it appeared that a Tennessee building and loan association made a loan to a citizen of Alabama upon the latter's signed appli-

cation solicited by a traveling agent for the association, who took a note and mortgage as security therefor, both executed within the state of Alabama, the mortgage being upon real estate located in that state. The loan association's officers had complied with some of the laws of the state of Alabama relating to foreign building and loan associations, but not with all of them. A suit to foreclose this mortgage was brought by the Tennessee corporation and the proceeding was allowed to succeed in the trial court. The Circuit Court of Appeals for the Fifth Circuit, however, reversed the decree so rendered. Affirming the action of the court last named and considering itself bound, under a familiar legal principle, by the strict rule of the Alabama cases in their holding that a foreign corporation's doing of a single act in the exercise of its corporate powers within Alabama constituted the doing of business within that state under the broad language of its Constitution and statutes, the Supreme Court of the United States, after citing cerain Alabama cases, said:

"These cases constitute an interpretation of the constitutional and statutory provisions, and clearly hold that any act in the exercise of corporate functions is forbidden to a foreign corporation which has not complied with the Constitution and statute, and that the contracts hence resulting are illegal and cannot be enforced in the courts."

We deem it unnecessary to point out the difference between the facts there involved and those at bar. They are quite manifest from the statement hereinabove given.

The Alabama Constitution forbade a foreign corporation from doing "any business" in that State unless certain requirements were met. Our constitutional provision recited above does not seem to be quite so broad. However that may be, the Alabama rule touching such matters is regarded as much more strict than

prevails in most jurisdictions. See 9 Fletcher Cyclopedia Corporations (1st Ed.) Sections 5919-5920 and cases cited.

As indicative of the attitude of the national court, when untrammeled by the limitations established through state decisions, the case of Green v. C. B. & Q. R. Co., 205 U. S. 530, 27 Sup. Ct. 595, 51 L. Ed. 916, is illuminating. In that case the validity of service of process depended upon whether the railroad corporation was doing business in the eastern district of Pennsylvania in such a manner and to such an extent as to warrant the inference that through its agent it was present there. The facts were that the corporation had placed one of its employees, designated and advertised to the public as district freight and passenger agent, in an office hired by it in the city of Philadelphia. This agent solicited and procured passengers and freight to be transported over the railroad's line, whose eastern terminus was in Chicago, Illinois. For the conduct of this business several clerks and sundry traveling passenger and freight agents were also hired, who reported to and acted under the direction of this employee in Philadelphia. However, no tickets were sold or freight payments received by him, but he did receive money for prepaid orders for tickets over the road out of Chicago. In some instances he gave bills of lading over the road's line to shippers who had already received from the initial line bills of lading for freight routed over the former. These bills so issued recited that they should not be operative until the freight was actually received by the corporation. Upholding the judgment below deciding that the service of process on the Philadelphia representative of the railroad was invalid, the court said:

"The business shown in this case was, in substance, nothing more than that of solicitation. Without undertaking to formulate any general rule defining what

transactions will constitute 'doing business' in the sense that liability to service is incurred, we think that this is not enough to bring the defendant within the district so that process can be served upon it."

See also Cooper Mfg. Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. Rep. 739, 28 L. Ed. 1137.

Among the Alabama cases referred to by the United States Supreme Court in the Denson case, supra, is that of Sullivan v. Sullivan Timber Co., 103 Ala. 371, 15 So. 941, 25 L. R. A. 543. In that case a Florida corporation was charged with doing business in Conecuh County, Alabama. Service of process was made in that county upon its president. The corporation owned a sawmill in Escambia County and also a railroad running therefrom three or four miles into the county first mentioned, together with a derrick in that county theretofore used for supplying the mill with logs. This mill had been shut down, however, and about the time the suit was begun the defendant had a person in possession who took care of the railroad and derrick. Subsequent to the commencement of the suit an agent of the company paid the taxes on its property in Conecuh County. It was held that these actions on the part of the corporation were not a doing of business within the meaning of the Constitution and statutes of Alabama. After reciting their provisions, the court inter alia said:

"The mere presence of an agent within the state, or within a particular county, authorized to transact particular business, not involving an exercise of the corporate powers or franchises, not a part of the business the corporation was created and organized to transact, is not within the proper meaning of the phrases 'do business' or 'does business,' as employed in the constitution and the statute. (Citing cases.) * * * And according to all the authorities, construing similar constitutional or statutory provisions, having in view the like objects or purposes, there are many acts of

business a foreign corporation may do without coming within the constitutional or statutory provision. * * *

"The operation of the mill had been suspended, and the railroad and machine were unemployed. The care and protection of unused property, or the payment of taxes which are a charge upon the property, and the payment of which is essential to the preservation of the title to the owner, cannot be deemed the exercise of corporate powers or franchises, nor the transaction of the business, or any part thereof, for which the company was created and organized. These acts did not confer upon the courts of the county jurisdiction to entertain a personal action against the company."

A similar ruling appears in a subsequent case, that of State v. Anniston Rolling Mills, 125 Ala. 121, 27 So. 921. That was an action by the State itself to recover a sum claimed to be due it from the corporation for doing business in the state after February 18, 1897. Briefly the facts were that in 1895 the Anniston Rolling Mills leased its mills located in Calhoun County, Alabama, to the Anniston Iron & Steel Company. In 1897 this lease was still effective and rents were collected from the lessee by the lessor for the months of January, February, March and April 1897, for the use of the plant under said lease. The Anniston Rolling Mills had insured its plant for the year 1897 against loss or damage by fire, had assessed its property for taxes, and employed attorneys to represent it before the Court of County Commissioners of Calhoun County in securing a reduction of its taxes, and then had paid them. During the year 1897 it had a board of directors consisting of five members, all of whom, except one, resided in Anniston, and the books of the company were regularly kept by the secretary. The defendant also kept an account in a bank and had $1,000 loaned out at interest and collected the interest during the year 1897. At one meeting they elected a secretary and treasurer; at several other meetings they discussed

business relations existing between their company and the Anniston Iron & Steel Company; and at another meeting they authorized the payment of a fee to its attorneys for representing them in the tax case before the Commissioners' Court, and authorized the service of notice upon the lessee of the cancellation of the lease. The Anniston Rolling Mills was a corporation organized under the laws of Alabama, and it admitted that it had failed to take out a license. The question submitted for decision was whether that company was "doing business" within the meaning of the law requiring the payment of a license fee during the year 1897. The State failed in the trial court and appealed. Affirming the judgment, it was remarked that:

"The real test is, is the corporation engaged in the transaction of business, or any part of the business, for which it was organized or created? Beard v. Publishing Co., 71 Ala. 60; Sullivan v. Timber Co., 103 Ala. 371, 15 South. 941, 25 L. R. A. 543. The record shows that the appellee corporation was organized for the purpose of 'buying, manufacturing, and sale of iron, and of articles of merchandise or manufacture in which iron is used, and the buying and selling of such manufactured articles.' The record does not show that the appellee was engaged in the transaction or doing of such business, or any part thereof, during the year 1897. Not one of the several acts of the corporation done by it during the year 1897, as shown by the record, constituted a doing of the business, or any part of the business, for which it was created, and were mere incidents for the preservation of its property."

In the comparatively late case of Ford Motor Co. v. Hall Auto Co., 226 Ala. 385, 147 So. 603, an explanation of its previous rulings was made by the court thus:

"To constitute doing business, the acts done must be done in the 'exercise of corporate functions,' and be distinguishable from acts 'done merely within corporate powers.'"

Recalling that taxes are not debts in the ordinary sense of that word but are obligations imposed by the government for its support or for some special purpose, which the government has recognized and are due to the government in its sovereign capacity, while debts are due to the government in its corporate capacity (Liberty Mutual Insurance Co. v. Johnson Shipyards Corporation, 6 Fed. 2d 752) it may be observed that the case of Tidey v. McDonald, Circuit Judge, 179 Mich. 580, 146 N. W. 224, is pertinent because like debts taxes are obligations which property owners are required to pay. That was an action in mandamus to compel the judge to dismiss certain capias proceedings against a relator. Concerning one of the points raised the court said:

"The contention that Moodie & Sons, Limited, being a foreign limited partnership, are not authorized to do business in this state requires little consideration, as the record discloses no attempt on their part to do business in the state beyond an effort to pay a debt to parties located in this state, the remittance for which went astray. Paying debts to parties in this commonwealth is not a line of business, nor doing business, which the statute was designed to prevent."

The traveling salesman of a foreign corporation which had no place of business in Missouri, negotiated the lease of a typesetting machine to a publishing company in that state whereby the lessor agreed to furnish employees to set up the device and instruct the lessee's employees in its operation. The expenses of these employees, as well as the taxes thereon, were to be paid by the lessee, it also being required to reimburse the lessor for the cost of insurance. The lessee was also given an option to purchase the machine, but the lease was subject to the approval of and was finally executed by the lessor in New York. In an action on the lease contract the defense was interposed that the plaintiff was a foreign corporation which had not complied with

the state law. Ruling adversely to this defense, in Mergenthaler Linotype Co. v. Hays, 182 Mo. App. 113, 168 S. W. 239, the court declared that:

"The paying of taxes and premiums on insurance policies by the lessors could not be construed as an act of the plaintiff in carrying on business in this state. Many foreign corporations must pay taxes in Missouri on their property located here, and still they may not be violating any statutes relative to doing business. The power to tax retained by the states is entirely different from the power to deal with commerce between citizens of the different states. * * *

"The mere ownership of personal property by a foreign corporation is not prohibited under the Missouri law. It is a doing of business in Missouri with that property that the statutes are designed to reach. As to such property standing idle the foreign corporation would be required to pay taxes, would be permitted to protect it by insurance, and would be permitted to commence an action for the recovery of possession of the same, provided it was denied possession by wrongful act of another. See United Shoe Machinery Co. v. Ramlose, 231 Mo. 508, 132 S. W. 1133."

Of similar import is the case of North American Mortgage Co. v. Hudson, 176 Miss. 266, 168 So. 79, where the facts were, shortly stated, that a mortgage company, a foreign corporation which had an office and was doing business at Bozeman, Mont., brought a suit to recover certain property sold by the Foreman Company of Chicago, Ill., to Hudson, taking mortgage security for the purchase money, said notes being payable to Foreman at Chicago, Ill., and sold thereafter to the mortgage company. The indebtedness thus incurred bore eight per cent interest evidenced by notes for the principal at seven per cent, and a separate note for one per cent interest, which was to be retained by the Foreman Company for servicing said collections, that is, collecting interest, paying taxes, etc., for the mortgage company. The Foreman Company employed an

attorney in Mississippi on a salary basis to attend to this servicing. The defendants pleaded in abatement non-compliance by the mortgage company with the state law requiring certain filings to be made by non-resident corporations doing business in the state. Rejecting this defense the court said:

"This appellant had not done business within the meaning of these statutes. It had purchased commercial paper secured by deeds of trust in this state, and had acquired title to certain property in this state; but it is not within the contemplation of our law that such purchasers of property in Mississippi, where no office is maintained here for that purpose, shall be deemed as doing business here. It is not contrary to the public policy of this state that a foreign corporation may own notes and deeds of trust, and may proceed to collect same through the courts of this state, nor does that constitute the doing of business within the state. The collecting of notes alone, and the foreclosure of deeds of trust by an agent in the state of Mississippi, who may, pending such foreclosures, rent or lease the property, where the purpose of the company is merely to realize upon such mortgages, and other securities, is not doing business within the meaning of the Mississippi statutes on the subject."

The judgment of the trial court upholding the defense was accordingly reversed.

It would appear under the rulings announced in these decisions that the mere payment of taxes and, as a logical conclusion therefrom, the redemption of property from tax sale by a foreign corporation in Wyoming would not be the transaction of business within this State within the meaning of our Constitution and State statutes above cited, even if we were to invoke the extremely strict rule of interpretation in their application.

We may observe, too, that relator concedes "that if the Omaha National Bank had never done anything in the State of Wyoming except on December 22, 1934,

to walk into the Laramie County Treasurer's office and offer redemption of the property covered by relator's certificates of purchase, such action may not be considered the doing of business." But relator urges nevertheless that in view "of the continuity of conduct" and other acts done by The Omaha National Bank in this State as to other unrelated business matters, as well as touching the one involved here, a different conclusion must ensue. She says that the evidence herein discloses that The Omaha National Bank has at least three times been appointed active trustee of express trusts, evidenced by trust instruments covering real estate located in at least three counties in Wyoming; that as such trustee it had the right to exercise plenary powers, so far as the trust instruments under which it was appointed were concerned; that its appointment as trustee was in each instance for a stipulated compensation; that its actual activities under these trust instruments consisted in sending employees, agents or officers into this State for the purpose of having the trust property inspected; that it has as trustee employed residents of Wyoming to continue abstracts of title and make surveys of county records for the purpose of determining the condition of the property as to taxes; that it has taken chattel mortgages on crops grown on the trust property; that it has demanded and received copies of leases between the mortgagor of and tenants on the trust property; that it has engaged the services of a resident of Wyoming to collect payments on property sold by the mortgagor and remit such payments to the bank at Omaha; that it has arranged for its name to be placed as payee on checks issued by a corporation for sugar beets grown by crop-share tenants on the trust property; that it has conducted litigation in this State; that it has taken chattel and real estate mortgages to secure loans to citizens of this State, and in connection

therewith caused appraisals of property to be made; and solicited business from state banking institutions.

In connection with this evidence appearing in the record we are required also to consider the testimony of one of the executive officers of The Omaha National Bank to the following effect: The bank has been loaning money to residents of the State of Wyoming continuously for a number of years; these transactions are handled by receiving an application for a loan made either in person by the prospective borrower or by letter; this application comes before the discount board of the bank at Omaha; if the application is made for a loan upon livestock, an official of the bank comes to Wyoming, inspects the livestock, returns to Omaha and his report is referred to the discount committee, and it is there decided what shall be done with it; that if the loan is approved the papers are prepared in Omaha and sent to Wyoming for signature; that thereafter they are returned to Omaha, and if everything is satisfactory the bank advances the funds to be loaned, depositing them either to the credit of the individual or corporation seeking the loan, or, if it is preferred, a draft is sent out to the borrower; that the bank has never had a representative in any capacity resident in the State of Wyoming; that occasionally the bank hires an attorney or some livestock appraiser to do the work and look after the Wyoming loan, who reports to the bank at Omaha in accordance with instructions given as to how inspections should be made; that the bank has from time to time taken chattel mortgages, which have been filed or recorded in Wyoming; that this is the bank's usual practice on livestock loans; that on livestock loans inspections are made at least once a year, sometimes oftener; that if the matter is a large one inspectors are hired to make appraisals and count the livestock; that such precautions are necessary in looking after a livestock loan; that The

Omaha National Bank has never had an office in Wyoming; that the real estate mortgages are taken simply as additional collateral security.

The case of Burlington Savings Bank v. Grayson, et al., 43 Idaho 654, 254 Pac. 215, was an action for the foreclosure of a mortgage. The plaintiff savings bank was a Vermont corporation organized for the purpose of loaning money on real estate mortgages, and it had not complied with the Idaho law governing foreign corporations doing business in the state at the time the particular loan involved was made and assigned. The Graysons had given their note and mortgage on Idaho land to one Wilson at Bellevue, Idaho, and later the mortgage was assigned to the Burlington Savings Bank. Subsequently the Graysons executed two notes and mortgages covering the same land to one Campbell. The mortgage held by the Savings Bank was foreclosed adversely to the interests and contentions of Campbell, on the theory that the Burlington Savings Bank had not been doing business in Idaho. The Supreme Court of Idaho affirmed this judgment, and, reviewing the points advanced by Campbell, said in the course of its opinion:

"Appellant urges that there were a number of other transactions of a similar nature wherein loans were made by the Blaine County National Bank or its officers in Idaho and the notes subsequently sold to respondent; also, that because certain officers of respondent examined the land covered by the mortgages in question and stated in Idaho that they approved the security and said they would recommend the loan, the respondent was doing business within the state. Our latest expression upon this subject is Portland Cattle Loan Co. v. Hansen Live Stock & F. Co. (Idaho) 251 P. 1051, wherein it was held that soliciting loans and taking applications for loans by agents of a foreign corporation and forwarding the same to the home office of such corporation, there to be approved or disap-

proved by the home office, did not constitute doing business within the state. * * *

"In the case at bar the only evidence with regard to where the loan in question was purchased by respondent was to the effect that it was in Vermont. The note, mortgage, application, and abstract were sent by the Blaine County National Bank to respondent in Vermont, the loan was approved and accepted there, and the money was sent from Vermont through regular banking channels and eventually passed to the credit of the Blaine County National Bank at one of its correspondent banks. There was no testimony that the parties who made this loan or any of the loans which the respondent purchased were acting as agents for respondent. In all instances save two or three the other loans referred to were first made by the bank in Idaho and subsequently sold to respondent. In one or two instances, at the most three, loans were made direct between respondent in Vermont and residents of the state of Idaho, but even those transactions depended for their approval upon action in Vermont. Respondent had no money in Idaho; it had no place of business in Idaho, and it had no agent in Idaho who had authority to bind respondent or to accept a loan on its behalf. * * *

"Even though there was a steady course of dealing between the respondent and the bank or its officers in Hailey whereby respondent purchased from time to time the securities offered, the same would not constitute doing business on the part of respondent. Gen. Motors Acc. Corp. v. Shadyside Coal Co. (W. Va.) 135 S. E. 272; Monaghan & Murphy Bank v. Davis, 27 Ariz. 532, 234 P. 818. The authorities seem to be quite uniform to the effect that where money is loaned without the state by a corporation unlicensed to do business within the state the mere giving of a note and mortgage on property within the state as incident to such transaction does not constitute, on the part of the foreign corporation, doing business within the state. Monaghan & Murphy Bank v. Davis, Supra; Gen. Motors v. Shadyside Coal Co., supra; McKee v. Stewart Land & Live Stock Co. (Ariz.) 238 P. 326; Davis & Worrell v. Gen. Motors Acc. Corp., 153 Ark. 626, 241 S. W. 44; Jones v. Gen. Motors Acc. Corp., 205 Ky. 227,

265 S. W. 620; Lloyd Thomas Co. v. Grosvenor, 124 Tenn. 347, 233 S. W. 669; Cancelmo v. Seaboard Air Line Ry. (App. D. C.) 12 F. (2d) 166; Finance & Guaranty Co. v. West Auburn Creamery Co., 69 Pa. Super. Ct. 261. Nor is the foreign corporation doing business within the meaning of such statutes by purchasing in another state negotiable securities executed within the state. 14A, C. J. 1283.

"Our own court has recognized the above principle and the additional proposition that the foreclosure of such a note and mortgage is not doing business within the state. Bonham Nat. Bk. v. Grimes Pass. P. M. Co., 18 Idaho 629, 111 P. 1078; Diamond Bank v. Van Meter, 19 Idaho 225, 113 P. 97; Largilliere Co. v. Mc-Conkie, 36 Idaho 229, 210 P. 207."

To like effect is the decision in Davis & Worrell v. General Motors Acceptance Corporation, 153 Ark. 626, 241 S. W. 44. There the court outlined the facts presented by the record in the following language:

"It is true that it was a part of the business of the plaintiff corporation to discount notes of this character, and that it did discount notes purchased from about 40 dealers in motor vehicles in the state of Arkansas. The plaintiff was organized under the laws of the state of New York, and had a branch office at Dallas, Tex., where it transacted its business with residents of the State of Arkansas. It furnished dealers of motor vehicles in Arkansas with whom it contemplated doing business with blank forms of contracts to be used by such dealers in selling their motor vehicles. There was a place on such form for the purchaser of the motor vehicle to make a statement of his financial condition. The dealer was required to send in to the plaintiff at Dallas, Tex., a statement of his financial condition, and an investigation of his financial condition was also made through reports by commercial agencies and otherwise. Then the plaintiff would agree to extend a general line of credit to such dealer. The dealer in making a sale would take the note of the purchaser on one of the blank forms furnished by the plaintiff. This was all done, however, to better enable the plaintiff to pass upon the securities offered it for

discount. The plaintiff had no interest whatever in the business of the dealers from whom it bought such commercial paper. It had no established agency in this state. In each instance the paper was sent to its office in Dallas, Tex., and accepted there. The money was paid there, or through a bank in Chicago upon orders of the home office in New York. Thus it will be seen that the contract was made and the money paid in each instance outside of the state. The applications for sale of commercial paper were received by the plaintiff at its office outside of this state. They were passed upon there and accepted or rejected there. The plaintiff had no agency in this state, and the mere fact that it acted upon applications coming through residents in this state would not constitute doing business in this state within the meaning of the statute."

And upon these facts it was held "that in a case like this, where the foreign corporation had its place of domicile in another state and discounted commercial paper of parties with money paid out in such other state on applications made to it there through dealers in this state, such transactions do not constitute doing business in this state by such foreign corporation."

These decisions would seem to indicate with reasonable clarity that relator is mistaken in her contention touching the effect of the asserted continuity of conduct on the part of The Omaha National Bank relied upon by her and outlined above. The challenged course of conduct on the part of Intervener Bank appears to have been nothing more than either the performance of acts entirely without this state or acts which any foreign corporation may do in another state in the carrying on of interstate commerce or the doing of those things which any corporation foreign or domestic may do for the simple and essential purpose of protecting and preserving its property. Such conduct is not regarded as transacting business within the proper interpretation of applicable constitutional and statutory provisions resembling those of this state. See

also, Sasnett v. Iowa State Traveling Men's Ass'n., 90 Fed. (2d) 514; Maxfield v. Canadian Pac. Ry. Co., 70 Fed. (2d) 982; Colbert et al. v. Toll et al., 31 Fed. (2d) 837; Minty v. Draper & Co., 57 Fed. (2d) 551; Continental Assurance Co. v. Ihler, 53 Idaho 612, 26 Pac. (2d) 792; Industrial Acceptance Corporation v. Haering, 253 Ill. App. 97; State ex rel. American Laundry Machinery Co. v. Second Judicial District Court in and for Silver Bow County, 98 Mont. 278, 41 Pac. (2d) 26; Holston National Bank v. American Christian Missionary Society, 11 Tenn. App. 72; First State Bank of Harvard v. Harrington, 192 Wis. 293, 212 N. W. 665.

The law of this state requires the owner of real estate to pay taxes thereon at a certain fixed time in each year. If he does not do so his property is subject to be sold to make the taxes and he loses his title to such property unless he or some one who has an interest therein redeems it as the law provides. A mortgagee of such property and a trustee in a trust deed covering it have such an interest as entitles them to redeem if the owner does not. These are extremely familiar and elementary principles with which every business man in this jurisdiction is acquainted and need no citation of authorities or statutes to support them. When such parties do so redeem they are only doing what the law itself expects and requires them to do in order to preserve their title or interest in their property.

Even if we should assume—contrary to what we believe the state of the law to be—that The Omaha National Bank in its dealings with citizens and corporations resident in this state, as outlined above in connection with relator's contention, was acting in direct violation of the Constitution and statutes of this State, we are unable to perceive how that fact should or could transform the acts of paying taxes or redeem-

ing from tax sales, acts which as already stated every one recognizes the law enjoins, into wrongful or void transactions. Putting this matter another way, to affirm such a doctrine would be to assert that disobedience to law in other matters and in other respects taints and destroys as illegal an act done in explicit obedience to the law. Such a conclusion, to say the least, may fairly be regarded as decidedly illogical.

The general policy of the law concerning redemption of lands from tax sales is thus stated in 4 Cooley on Taxation, 4th Ed., Section 1558, pages 3064-3065:

"It is not the policy of the law that any man should forfeit his estate because from inability, or even from negligence, he has failed to meet his engagements or to perform his duties by some exact day which has been prescribed by statute. On the contrary, it is for the welfare of every community that the law should favor the citizen in all reasonable measures for the preservation of his estate against losses which result from his misfortunes or his faults, extending to him all the liberality that is consistent with justice to others and to a proper regard for the interest of the public. The principle is recognized in the liberality shown to those desirous to redeem from the technical forfeiture of mortgage estates, as well as in the provisions made for redemption from judicial sales. It is also very properly recognized in the laws providing for redemption from tax sales."

Recalling that the proof is not disputed that the bondholders themselves under the trust deed advanced the money with which the redemption in the case at bar was accomplished, even if we could find some substantial reason for concluding that the trustee under the mortgage was disqualified to make the redemption, we are quite clear that it would be our duty to hold that the redemption thus made was one in fact accomplished by the bondholders to protect their own investments. The trustee was but the conduit through which

the money of the beneficiaries under the trust passed to the County Treasurer. It would be harsh, indeed, to penalize such beneficiaries because the conduit was not properly constituted. It makes little substantial difference to the State, the owner of the property, or third persons how the beneficiaries' redemption money reached the County Treasurer's hands so long as it came at the proper time and in the requisite amount.

This court has heretofore pointed out that equitable principles and sound judicial discretion control the issuance of the writ of mandamus. (State v. Board of Land Commissioners, 50 Wyo. 181, 58 Pac. (2d) 423.) And when the status of the bondholders under the $66,000 trust deed and bond issue, with reference to the redemption proceeding in question, is viewed from every angle, we have little hesitation in saying that it would be most inequitable to overthrow the action of the County Treasurer in recognizing that a redemption of the property of the Livestock Company had been accomplished so far as certificates of purchase numbered 1862 and 1863, aforesaid, were concerned. The money was paid within the legal redemption period, it was the amount required by law therefor, the State has received its tax money, and the assignee of the certificates of purchase has only to call upon the County Treasurer for reimbursement, with interest, as to the investment made by her in the tax purchase certificates whenever she so desires.

It is argued at length for relator that The Omaha National Bank was required at the peril of its property interests to comply with the constitutional and statutory requirements quoted above. It is significant that so far as we are advised no national bank, whether located in this State or in a sister State, which loans money to residents of Wyoming, has ever been required to make any filings such as are now insisted should have been made by the trustee to enable it to pay

legally the redemption money aforesaid. The office of the Secretary of State of Wyoming has never since statehood, so far as this court is informed, taken the position that all such institutions must make filings of this character. This condition has prevailed for a period of nearly half a century. Yet the language of the constitutional provision above quoted is broad enough in terms ·to include national banks located in Wyoming, as well as those whose places of business are in other jurisdictions. It is significant, also, that no decision or statute has been called to our attention which indicates that a national bank has any authority whatsoever to make filings of this character and thereby bind itself by state constitution and state law in the particulars recited above.

Finally, it is both pertinent and instructive relative to this phase of the case at bar here to note that the Attorney General of Wyoming more than thirty-six years ago, in response to the inquiry "whether a nonresident national bank transacting business in the State of Wyoming is required to file an acceptance of the Constitution before transacting business in this State," proceeded to quote the constitutional provision hereinabove set forth, and then said:

"This is not held to apply to corporations formed under and by virtue of Federal law. National banks are organized under the laws of the United States, and it has been held here that as such they are not required to file an acceptance of the Constitution, the United States being a jurisdiction embracing Wyoming as well as her sister States, and corporations organized under Federal law are resident corporations of Wyoming the same as of all other States.

"I am, therefore, of the opinion that a national bank, being a corporation organized under and by virtue of the laws of the United States, is not required to file an acceptance of the Constitution before transacting business in this State, although its principal place of business may be located in another State."

The officer whose views were thus expressed was subsequently a member of this court and for many years thereafter a Justice of the Court of Appeals of the District of Columbia.

No formal opinion to the contrary of the views thus expressed seems to have been issued by subsequent Attorney Generals, so we have before us the situation presented of the executive office charged with the enforcement of the constitutional and statutory provisions here involved (See State v. Board of Land Commissioners, supra), together with the State's chief legal representatives, over a period of very many years, acquiescing in the position taken herein by The Omaha National Bank. While this situation is not perhaps essentially necessary to direct an affirmative answer to the question propounded above for solution in this litigation, yet it, of course, leads to the same conclusion we have heretofore indicated when viewing the case in its other phases. We are inclined to think that the practice of the office of the Secretary of State of Wyoming and the position taken by the Attorney General that such a corporation is not required to make the filings legally exacted of a foreign company in Wyoming, are based upon substantial foundation.

In Twin Falls National Bank v. Reed, 44 Idaho 473, 258 Pac. 526, a national bank with its principal place of business at Twin Falls, Idaho, sued to recover the balance due on a promissory note. It was contended on behalf of the defendant that the note was unenforceable under Idaho C. S. 4775 for want of an allegation in the complaint that plaintiff had complied with C. S. Sections 4772 and 4773 authorizing foreign corporations to transact business in Idaho. The two last mentioned sections required "Every corporation not created under the laws of this state" to make cer-

tain filings before doing business therein. Section 4775 provided:

"No contract or agreement made in the name of, or for the use or benefit of, such corporation prior to the making of such filings as provided in sections 4772 and 4773 can be sued upon or enforced in any court of this state by such corporation."

Affirming a judgment for the bank and rejecting the contention thus made, the court said:

"C. S. §§ 4772 and 4773, are intended to apply to foreign corporations, not to national banks organized and doing business in Idaho under acts of Congress. Such corporations, while not created under the laws of the state Legislature, are lawfully created in this state and authorized to do business in this state under the laws sovereign in this state."

We shall not lengthen this opinion further, although much more might be advanced in support of the result we shall announce herein. The controlling question hereinbefore set forth requires an affirmative answer. In view of what has above been said, our disposition in the matter necessarily is that the district court of Laramie County was right in denying the application for a peremptory writ of mandamus and its action in so doing is accordingly affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.