Arthur E. OELAND, Administrator of the Estate of Edward L. Boedeker, deceased, Appellant, (Plaintiff below),

v.

NEUMAN TRANSIT COMPANY and Kenneth Boyer, Appellees, (Defendants below).

Arthur E. OELAND, Administrator of the Estate of Bernard Fuller, deceased, Appellant, (Plaintiff below),

v.

NEUMAN TRANSIT COMPANY and Kenneth Boyer, Appellees, (Defendants below).

Nos. 2977, 2978.

Supreme Court of Wyoming.

Oct. 31, 1961.

Robert R. Rose, Jr., Casper, for appellant.

Edward E. Murane, of Murane, Bostwick & McDaniel, Casper, for appellees.

Before BLUME, C. J., and PARKER, HARNSBERGER, and McINTYRE, JJ.

Mr. Justice HARNSBERGER delivered the opinion of the court.

The administrator of the estates of both Fuller, deceased, and Boedeker, deceased, brought separate actions for damages for their wrongful deaths against the same defendants. These actions were consolidated for trial before a jury which, in each case, returned its verdict in favor of the defendants, and judgments accordingly were rendered thereon. Plaintiffs have appealed.

In both actions it was alleged the negligent operation of a trailer-truck combination by its driver, defendant Boyer, caused it to collide with the Pontiac automobile driven by the deceased Fuller, resulting in his death and that of the deceased Boedeker, who was a passenger in the Pontiac, together with one Marvel who survived.

The collision occurred in an area where the highway curves at the crest of a hill to which the highway from the north ascends within a distance of seven hundred feet to about twenty-five feet in height above mesne ground level and from which the highway then descends going south about eighteen and three-fourths feet to mesne ground level over a distance of nine hundred feet.

A small model received in evidence was stipulated as being generally similar to the vehicle driven by Boyer. It consisted of a truck or tractor having two front or steering wheels, one of which was on either side of the truck, and eight driving wheels at the rear. Four of these drivers were on either side of the truck, mounted in pairs referred to as duals, with one set of duals being immediately in front of the other. On the bed of the truck was a "fifth" wheel, near the rear, mounted horizontally. This supported the front end of the trailer. The rear end of the trailer was supported by eight wheels mounted in the same manner as the drivers of the truck.

Testimony and evidence reveal the following: The truck-trailer combination was traveling from north to south and the Pontiac was traveling from south to north; the eye level of the truck driver in the cab was seven feet and seven inches; the top of the Pontiac headlights was thirty-seven inches from the road; the weight of the truck-trailer combination, as it was loaded, was approximately 67,000 pounds; the oil mat of the highway in the accident area was twenty-eight feet in width; the curve was one of five degrees per one hundred feet and commenced three hundred feet north from the top of the hill and ended three hundred and fifty feet south of the top of the hill, thus making the length of the curve six hundred and fifty feet; Fuller was driving the Pontiac and Boedeker was asleep in the rear seat of the Pontiac, while Marvel was in the front seat asleep beside the driver; the three occupants of the Pontiac went to Rawlins about 6:00 p. m., after first purchasing a six-pack of beer, and en route purchasing three bottles of beer; at Rawlins, between 7:30 p. m. and 9:00 p. m., Fuller had five to seven whiskies, and when the three men left the bar they acted as if they had a little too much and they staggered; around 9:00 p. m. two girls got in the car with Fuller, Boedeker and Marvel and the five went to a restaurant where one of the men was served beer and the other two were served with mixed drinks; Fuller then got a six-pack of beer from a liquor store, and each of the five persons drank one bottle; after driving around Rawlins until 12:00 midnight, the girls went home; about midnight Fuller had two beers at the bar and two beers with a lady, after which he left the bar about 1:20 a. m. Boyer was the only living eyewitness of the accident.

In summary, Boyer testified that the truck-trailer combination was fifty-nine and one-half feet in length, the trailer body being forty-four feet in length, but as the trailer overlapped the tractor, the length of the tractor was left undetermined; on October 1, 1958, about the hour of 1:45 a. m., Boyer was driving the truck-trailer combination upon his right side of the highway, coming from the north toward the south, at a speed of between forty-seven to fifty miles per hour as he approached an area with which he was familiar where the highway curved to his left as it ascended and curved around a hill; the night was dark,

cold and cloudy and the highway was dry; there were no trees or vegetation in the surrounding area except sagebrush; as Boyer approached the curve and hill, the first thing he noticed was reflection of headlights of oncoming traffic; this did not mean anything to Boyer except there was some traffic coming toward him, so he "held" on his own side of the road; as the Pontiac flashed into view, the first thing that was apparent then was tremendous speed and that the oncoming Pontiac was on Boyer's side of the road, apparently not realizing there was a curve; the Pontiac was going right on straight ahead; Boyer instantaneously jerked his truck to the left and immediately back hard to the right, realizing that the Pontiac had started to make the curve; in Boyer's own words, "as he flashed past my cab, he cleared me and I thought I was in the clear"; *up to that point* Boyer could not see anything but the *lights* of the Pontiac; Boyer "hit" the brakes when he first saw the car's headlights and at that time he was going approximately forty-seven miles an hour; the first impact of the Pontiac was with the left-front driver tire and wheel of the truck and occurred at a time when the right-front steering wheel of the truck was at the extreme right edge of the oil mat; and the first impact occurred approximately at the crown of the hill.

Photographic exhibits in evidence showing the highway at the accident area were interpreted by Boyer as indicating that skid marks, there shown to extend in a substantially straight line, were made by the right-rear dual wheels of the trailer when he first applied his brakes. Except at intermittent points, these skid marks continued for about seventy-five feet south to a point which Boyer fixed as being approximately that of first impact. The inner-right dual tire marks of the trailer were shown to be two feet four and one-half inches inside the left or wrong lane of the combination vehicle at the point the skid marks began. Other skid marks, commencing about thirty-six feet four inches from the point of impact as fixed by Boyer, were identified as being made by the skidding of the left-rear dual

wheels of the trailer and began at a point about six feet inside the left or wrong lane of the combination vehicle. The absence of left-dual-wheel skid marks of the trailer between the place where the right-rear duals of the trailer began to skid and where the left-dual-wheel skid marks commenced was explained as caused by the left side of the trailer's weight being relieved when the truck swerved sharply to the left, thus tipping the load to the right. The intermittent skidding marks were accounted for by the varying application of brakes and power. Markings on the truck's left-front driver tire and wheel were identified as the point of first impact between the Pontiac and the combination vehicle, and damage to the trailer's left-front dual wheel at the rear of the trailer and certain portions of its undercarriage was indicated as caused by the rear of the trailer running over the left front and side of the Pontiac.

Appellants insist the jury's verdicts and the court's judgments were not supported by the evidence and are contrary to law and evidence, and contend an instruction given by the court on imputed negligence was erroneous and prejudicial to them.

■ We keep in mind the rule adhered to by most appellate courts, and observed by this court, that where a verdict and judgment are claimed to be contrary to or not supported by the evidence, only evidence most favorable to the successful party, together with all inferences reasonably drawn therefrom, may be considered and conflicting evidence of the unsuccessful party be disregarded.

However, that does not mean, nor does it require, that we be blind to patent contradictions between the favorable testimony of the successful party's witness and physical facts and conditions in evidence which render impossible the truth of the witness' favorable testimony. This is more certainly true when the existence of such contradictory physical facts and conditions is established by the same witness, the accuracy of whose statements are of such vital importance.

There is also another comment which might well be made. Although we have a statute, § 1–140, W.S.1957, which prevents a person testifying adversely to a deceased person's representative in certain instances, the prohibition of that statute does not extend to the present circumstance. However, where the evidence of only a single living eyewitness is available, it behooves courts of appeal to examine meticulously the one-sided version such a witness gives and to scrutinize it closely in relation to established physical facts and conditions.

These important facts stand out in Boyer's testimony. He was on his right side of the road until he saw the Pontiac's headlights approaching on its wrong side of the road at a speed in excess of seventy-five miles an hour. Within one hundred feet of his then position, he jerked his sixty-foot equipment over to his wrong side of the road, applied the brakes, jerked the combination back to the right, and traveled to the right edge of the oil mat, all the while going at something less than forty-seven miles an hour, although the Pontiac was approaching at a speed in excess of seventy-five miles an hour.

From the photographic exhibits, it is apparent that when approaching the hill and curve from the north, the highway to the south beyond the hill and curve may be seen in daylight for some distance, but as the highway from the south approaches the hill and curve it cannot be seen from the north for a distance undetermined by direct testimony.

However, having in mind that the evidence showed the curve was at the hill and the curve commenced from the north at a point three hundred feet from its apex and continued to a point three hundred and fifty feet south of its apex, there was a distance in the neighborhood of six hundred and fifty feet where vision was affected by either the hill or the curve or both. Furthermore, Boyer testified that at first he saw only the *reflection* of the lights of a car, not the lights themselves. This would seem to definitely establish that he did not then see either the Pontiac or its headlights because they were not within range of his vision. Taken with other evidence, this indicates the hill obscured vision between the two vehicles. As Boyer testified he instantly applied his brakes when he first saw the Pontiac's headlights, thus making the skid marks shown upon the photographic exhibit with the rear wheels of the trailer, and that his brakes were applied within one hundred feet of the first impact, he established that his vision was obscured until the approaching vehicles were less than one hundred feet apart.

This leaves in gravest doubt the reliability of Boyer's testimony that on a dark, cloudy night, at the time when he did see the headlights of the Pontiac approaching at terrific speed, but when he could see nothing else but those headlights, he nonetheless was able to determine that the approaching Pontiac was on its wrong side of the road.

The further unreliability of Boyer's testimony is evidenced when he stated that upon seeing the headlights of the Pontiac he immediately applied his brakes, jerked his vehicle to the left, turning it from his proper side of the road to its wrong side, then back again to the right side so that his right-front steering wheel was at the edge of the oil mat when the first impact occurred is sought to be reconciled with his further statement that the impact occurred within one hundred feet of where he first applied the brakes.

Based on Boyer's testimony, the vehicles were approaching each other at a speed in excess of one hundred and twenty miles an hour, or two miles a minute. This means that they approached each other at the rate of one hundred and seventy-six feet per second. If less than one hundred feet were traveled by the tractor-trailer combination from the time he first saw the Pontiac headlights and applied his brakes until the first impact occurred, Boyer was claiming that at a speed of less than forty-seven miles per hour he was able to move his truck-trailer

equipment of fifty-nine and one-half feet in length from the right side to the left side and back to the right side of the road in considerably less than one second of time. This, of course, was impossible. And if Boyer was on his own side of the road when he first saw the Pontiac headlights and applied his brakes when he saw those lights, the skid marks on the highway would not be on his wrong side where he pointed them out on the exhibits but would have been on his own side of the road.

Again Boyer's testimony established the travel direction of his equipment immediately prior to the first impact by identifying skid marks on an exhibit as being made by the rear wheels of his vehicle. These skid marks showed the travel direction was at such an angle in relation to the course of the highway and across its center line markings that if the right-front steering wheel of the tractor was at the right edge of the oil mat, the left rear of the trailer would have extended across the Pontiac's lane of travel to within a very few feet of the edge of the oil mat, and almost completely blocking and obstructing the Pontiac's lawful lane.

Boyer's statement that when he first saw the Pontiac's lights the car was on its wrong side of the road was at best a pure assumption not justified by the facts portrayed by his further testimony. The hazardous condition which occasioned the accident was created by Boyer's own actions and cannot be excused by his assuming there was a peril which his other testimony failed to show existed.

On the other hand, was there contributory negligence on the part of the Pontiac's driver? Seemingly great stress was laid upon Fuller's drinking and that he was thought to have had too much to drink, and was seen to stagger around 9:00 p. m. the evening before the accident. Undoubtedly the jury had a right to consider that evidence and to draw its own conclusion as to Fuller's sobriety. But the crux of the question of contributory negligence is not found in the Pontiac driver's condition, but whether that condition was a contributing cause of the accident. From the Pontiac driver's standpoint, Boyer's evidence showed Fuller was confronted with an oncoming vehicle weaving first to one side then to the other side of the road so as to almost completely block traffic upon the oil surface of the highway. Even taking Boyer's statement as correct that the first impact of the Pontiac was with the left-front driver of the truck when that wheel was a foot or two on its own right side of the road, the major portion of the Boyer equipment so obstructed the whole highway that the soberest driver in the world could not have avoided colliding with the truck-trailer combination. Similarly, the excessive speed at which Boyer said the Pontiac was traveling was not necessarily a contributing cause. At the lawful speed of sixty miles per hour, it is as certain the driver could not have avoided striking the Boyer combination blocking the road within the split second of time available when the respective drivers came into view of each other.

As reluctant as we are to disturb a verdict of the jury and the judgment of the court based thereon, where the physical facts, as portrayed by the only witness who gave substantial testimony in support of defendant's position, belie that favorable testimony, we not only have the right but the positive duty of reversing. Without Boyer's favorable testimony the appellees had no defense. The view we take has ample support in 5A C.J.S. Appeal and Error § 1648, p. 343, n. 36, p. 347, n. 39, § 1649, pp. 365–367, n. 56.10, and 3 Am.Jur., Appeal and Error, § 891, pp. 451–452, together with the authorities cited in both these works, to the effect that where evidence is contrary to physical facts a verdict and judgment based thereon should not be sustained. See also 10 Blashfield, Cyclopedia of Automobile Law and Practice, Perm.Ed., § 6554, and 10B Blashfield, Cyclopedia of Automobile Law and Practice, Perm.Ed., § 6626.

·In the Boedeker case appellant also contends there was reversible error in giving the following instruction:

"You are hereby instructed that the meaning of the phrase 'under the influence of intoxicating liquor' means that a person has taken into his stomach a sufficient quantity of intoxicating liquor so as to deprive him of the normal control of his bodily or mental faculties. If you find that at the time and place of the accident the deceased, Bernard Fuller, was then and there under the influence of intoxicating liquor and if you further find that such condition contributed in any degree as a proximate cause of the accident, then and in such event, if you further find that Edward L. Boedeker, when he got in the car with Bernard Fuller and continued to ride in said car when he had actual knowledge or must have known that Bernard Fuller was under the influence of intoxicating liquor, you are instructed that Edward. Boedeker was guilty of contributory negligence and in that case Arthur E. Oeland, Administrator of the Estate of Edward L. Boedeker, deceased, cannot recover from the Defendants."

■ It is unnecessary to discuss this contention of appellant in detail in view of other conclusions reached. However, it might be said that the instruction placed undue emphasis upon being "under the influence of intoxicating liquor." 1 Reid's Branson Instructions to Juries, 1960 Repl., § 107, pp. 315, 316. Also the words "contributed in any degree" were of argumentative nature and in the context used tended to unduly stress the importance of the alleged intoxication. See Alexander v. Sullivan, 334 Ill.App. 42, 78 N.E.2d 333, 335; 88 C.J.S. Trial § 336, p. 877, n. 9, p. 878; 1 Reid's Branson Instructions to Juries, 1960 Repl., § 108. The crucial question was not whether Fuller was under the influence of intoxicating liquor, but whether Fuller operated his vehicle negligently. The stress placed upon being "under the influence of intoxicating liquor" by the instruction, at least, tended to mislead the jury into believing the intoxication of Fuller was the deciding factor.·

■ Furthermore, we call attention that it is not considered good practice to recite a principle of law and then conclude the instruction with a direction that if the principle is applicable that one or the other party should prevail. See 88 C.J.S. Trial § 327, p. 858, n. 33.

For the reasons set forth herein, the judgment of the district court in each case must be reversed and the cases remanded for new trial.·

Reversed and remanded.