FORD MOTOR COMPANY, Appellant
(*Defendant below*),
Harold Peterson and Slade Motor Company,
(Defendants below),

v.

Manuel ARGUELLO, Appellee
(Plaintiff below).

No. 3054.

Supreme Court of Wyoming.

June 19, 1963.

Harry L. Harris, Evanston, and Ray E. Christensen and Moreton, Christensen & Christensen, Salt Lake City, Utah, for appellant.

G. L. Spence and Spence, Hill, Oeland & Tschirgi, Riverton, and Vincent A. Vehar, Evanston, for appellee.

Before PARKER, C. J., and HARNSBERGER, GRAY, and McINTYRE, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

One of the defendants in this case, Ford Motor Company, has appealed from an adverse verdict and judgment in the District Court of Uinta County. Suit had been brought against Harold Peterson and Ford by Manuel Arguello, plaintiff, who was seriously injured while riding as a guest in a Ford automobile owned and driven by Peterson. The judgment was against both defendants and in the amount of $103,000.

The contentions made by Ford, on appeal, are these:

1. The courts of Wyoming have no jurisdiction over Ford Motor Company.

2. The evidence was insufficient to support a finding that the accident was proximately caused by any negligence on the part of Ford.

3. Plaintiff was guilty of contributory negligence as a matter of law and also assumed the risk as a matter of law.

4. Misconduct on the part of plaintiff's counsel prevented appellant from having a fair trial.

The accident in which Arguello was injured happened November 22, 1957. The automobile involved was a new 1957 Ford. Claiming gross negligence on the part of Peterson, the driver, and negligence on the part of Ford, manufacturer of the car, Arguello sued both the driver and manufacturer. The case was tried to a jury and a joint verdict was returned against both defendants. Peterson and Ford each filed notice of appeal from the judgment rendered on this verdict, but Peterson subsequently abandoned his appeal. The case is now before us for review on Ford's claim of errors.

At the trial Peterson complained of having difficulty steering his car from the time it was purchased. He had been told it was not "tracking." According to him it was inclined to pull to the right, particularly on winding roads or left-hand turns, and there was some problem about the tires holding air.

On the evening of the accident Peterson, Arguello, and Harold Hoopes stopped after work, on a construction job, and spent several hours at a bar in Fort Bridger, Wyoming. While there, Peterson claims he looked at the tires and they looked okay. During the time spent at the bar he and the others drank intoxicants. The testimony regarding just what and how much Peterson drank is conflicting.

Peterson had offered to drive Arguello and Hoopes to Lyman, Wyoming, and as the men left they took some beer with them. With Peterson driving and Hoopes next to him and plaintiff on the right of Hoopes in the front seat, the three started toward Lyman which is some four miles east of Fort Bridger.

Peterson immediately accelerated the car and after about one mile made the right turn of an "S" curve. According to Hoopes, he glanced at the speedometer just east of this turn and the car was going 85 miles per hour. Hoopes asked Peterson to slow down, but Peterson said he would do the driving. Arguello was leaning over Hoopes to adjust the radio and as they came around the curve he was pushed over on Hoopes. He testified that he glanced at the speedometer at that time, and it showed pretty close to 85 miles per hour. He also told Peterson to slow down because he

knew there was another curve coming, but Peterson continued his speed. Just at the beginning of the left turn of the "S" curve the car left the highway.

Sergeant Wold of the highway patrol was notified of the accident. He arrived soon after it happened and made an investigation. His testimony indicates the blacktop of the highway was 23 feet 6 inches wide. The graveled shoulder was about five feet wide, and from that point the road dropped off into a barrow pit.

His testimony further established that the automobile went off the blacktop of the highway and continued on the shoulder and in the barrow pit a distance of 240 feet, at which point it went over a "terraced off" place and landed 30 feet further along in the bottom of a drain ditch. It then rolled another 95 feet to the place where it came to rest.

This witness theorized that the car landed, after being off the ground for 30 feet, on its right-front wheel, with the vehicle sloping downward and tipped to the right. It made a deep "gouge mark" at the place of landing. Other witnesses appear to have accepted the theory that the automobile was in the air for a distance of 30 feet and that it landed as the patrolman said. It is not disputed that the force of the impact, when the vehicle landed, caused the spider of the right-front wheel to separate from the rim.

### Jurisdiction

In a separate opinion, Mr. Justice Gray fully discusses the question of jurisdiction. His views on that subject are the views of the court, and for the reasons stated in his opinion we hold the district court had jurisdiction of the subject matter and of Ford Motor Company for purposes of this case. The repetition of our reasons for so holding would serve no purpose in this opinion.

### Negligence of Ford

In view of our guest statute, it is clear from the verdict of the jury, against both defendants, that the jury found Peterson guilty of gross negligence and that his negligence was one of the proximate causes of the accident. It is equally clear that the jury found negligence on the part of Ford, in manufacturing the accident vehicle, and that this negligence was a concurrent proximate cause of the accident.

Although the evidence in that regard is in conflict, there was ample expert testimony for the jury to have found, and apparently it did so find, that some of the rivets holding the rim to the spider, on the right-front wheel, were inferior in quality. This would indicate poor metallurgical control and a lack of proper inspection for the purpose of keeping the quality of the rivets up to prescribed specifications, during the manufacturing process.

The spider of which we speak takes the place of spokes in a wheel. It is that part of the wheel that fastens onto the hub and the rim. It is a hollow-shaped disk, stamped and pressed of sheet steel and having four flanges which fasten to the rim. Each wheel has 12 rivets in a single line around the rim, with three rivets for each of the four flanges.

All rivets in this wheel which were in place and holding at the time of the impact were sheared off. In fact 11 of the 12 rivets were so sheared. The shearing effect caused rivet holes in the rim to be elongated in the direction of separation. For most of the holes, this elongation is visible to the naked eye without magnification. Two of the experts, however, on behalf of plaintiff, from laboratory examinations under magnification, corroborated this.

From their examinations, these two experts testified that one of the defective rivets, designated for identification purposes as number 11, had fractured prior to the accident so that it was not holding at the time of impact and was not sheared. Both witnesses said this fracturing would sooner or later allow the rivet to pop out of its hole and into the tire, which was a tubeless tire. The result would be a flat tire caused by air escaping out of the rivet hole. One of the witnesses went on to ex-

press the opinion, based upon his independent examination, that rivet number 11 was out of its hole at the time of the accident.

Peterson himself testified repeatedly, and without contradiction, that he felt a flat or low tire. He said he did not know whether it went all the way flat before the wreck, but it was leaking air and it felt like an awfully low tire. He described the result by saying it kept pulling me and pulling me farther and farther down into the ditch, and after he got down into the ditch he could not get back up on the road. Again, he explained that at the time it was happening he did not think the tire was clear flat, but that it was pulling more all the time. He insisted the tire being like it was is what pulled him into the barrow pit.

■ This testimony standing alone, if the jury believed it, would entitle the jury to find that the loss of air in the right-front tire was one of the causes for the automobile leaving the highway and therefore a concurrent cause of the accident. The tire itself was found after the accident to have no puncture and no place for rapid air escape, unless there had been an open rivet hole.

This, if the testimony of Peterson was believed, leaves the inevitable conclusion that the fractured rivet referred to in the testimony of plaintiff's experts popped out of the hole letting air escape, and that the low tire with Peterson's fast driving caused the vehicle to get out of control and wreck.

■ We have frequently said it is the function of an appellate court to ascertain whether or not there was substantial evidence upon which the jury could base its opinion if it believed the testimony, and that it is not for us to evaluate the evidence presented. Culver v. Sekulich, Wyo., 344 P.2d 146, 156. The jurors being the sole judges of the credibility of witnesses, we need not say whether they should or should not have believed the testimony of Peterson.

■ However, there are circumstances where the testimony of a single witness may not be sufficient to support a verdict, such as testimony which is contrary to known physical facts. See Oeland v. Neuman Transit Company, Wyo., 365 P.2d 806, 810. Therefore, we pause to examine Peterson's testimony with a view of determining whether it was corroborated by other evidence and whether it is in fact corroborated or contradicted by known physical facts.

### Other Evidence

It is undisputed that the automobile began to go off the blacktop and onto the shoulder of the highway at a point after a right curve and before a left curve. The tracks indicate that upon leaving the blacktop a rather straight course was followed. No part of the left curve being approached was negotiated, and it cannot be said the accident was one of inability, because of speed or intoxication, to make a curve. Moreover, neither of the other two passengers, both of whom testified, suggested any distraction or inattention to his driving on the part of the driver.

The highway here involved had a five-foot shoulder with gravel, between the blacktop and edge of the barrow pit. Hoopes testified, at least three different times, that the car felt like it had a pulling on it, or that it was pulling, and that then the gravel was coming up underneath the car. Also, he testified:

"We was still on the shoulder of the road and he held it on the shoulder of the road for quite a while until that big lunge come and then a little gravel right then, but we was off after the lunge, but he held it on the road for quite a while there."

If the car had merely drifted off the blacktop, and if there were nothing about the vehicle itself causing it to drift, as the evidence would seem to indicate, then the jury might well believe not only that the driver would have done something about the situation before a drift of five feet away from the blacktop, but that the other

passengers would have warned the driver he was getting off the road.

To demonstrate what a five-foot shoulder amounts to in width, we point out that the total blacktop in this case was 23 feet 6 inches wide, making 11 feet 9 inches for a driver's half of the roadway. This means that the driver on this highway is given a safety margin, on the shoulder, equal to 43 percent of his regular lane.

Not only did passenger Hoopes say the car was pulling and he heard the gravel coming up under the car, but he added, "I just knowed what was going on and I held on like this (indicating)." This testimony, which followed Peterson's testimony, must have meant to the jury that Hoopes thought something was wrong and the car was getting out of control.

This was verified rather definitely by the fact that one of the attorneys on cross-examination gave exactly that implication to Hoopes' testimony, and Hoopes did not correct it. The attorney asked, "Could you tell that the car was out of control or that there was something wrong before you got to this curve?" The witness went ahead to explain it was before they got to the curve. He did not correct the implication in the question that the car was out of control or that there was something wrong.

Additionally, there is physical evidence that the tire was substantially flat upon impact. This is verified by undisputed evidence showing that after the accident there were pebbles embedded between the tire and rim. Obviously, such pebbles could not have been picked up on impact if the tire had been fully inflated. But it would be quite logical for such material to be picked up if, upon impact, the tire were flat enough to be pushed to the inside as the wheel struck at an angle.

It is sufficient for our decision to say the jury was at least entitled to believe, from all the evidence before it, that something besides Peterson's reckless driving helped to cause the automobile in this case to go off the highway; that this something was a flat or low tire; and that the flat or low

tire was caused by rivet number 11 being defective, fracturing and popping out of its hole thereby letting air out of the tire.

If the jury did so believe, then it properly found that the negligence of Ford in permitting defective rivets to be used in the manufacture of the wheel was a concurrent and proximate cause of the accident in which plaintiff was injured.

### Additional Questions

■ As to whether plaintiff-Arguello can be said to be guilty of contributory negligence as a matter of law, or whether he assumed the risk of injury as a matter of law, counsel on both sides of the case have discussed the two matters together, and we shall do likewise. Distinctions between assumption of risk and contributory negligence have not been adopted in Wyoming. See Rocky Mountain Trucking Company v. Taylor, 79 Wyo. 461, 335 P.2d 448, 451; and Askin v. Dalgarno, 10 Cir., 293 F.2d 424, 426.

■ We cannot say as a matter of law to what extent Peterson was under the influence of intoxicating liquor. We do know from his own admissions and from undisputed evidence that he drove at an excessive speed. This was sufficient to constitute contributory negligence on the part of Peterson and to bar him from a recovery against Ford. The trial judge therefore properly directed a verdict in favor of Ford, on a cross-complaint by Peterson. That did not, however, constitute a finding that Peterson's drinking was a proximate cause of the accident.

■ Drinking on the part of Peterson is not denied, although the highway patrolman, a deputy sheriff and four other witnesses testified without direct contradiction that he was not "drunk." In any event it cannot be said as a matter of law that such drinking was a proximate cause of the accident. As stated in Lindemann v. San Joaquin Cotton Oil Co., 5 Cal.2d 480, 55 P.2d 870, 874, it is for the jury to determine whether the intoxication of a driver proximately contributed to an accident, unless

the court is compelled to say from the facts that reasonable men could draw no other inference.

■ It necessarily follows in the instant case that if the drinking of Peterson cannot be said as a matter of law to be a proximate cause of the accident, then his guest cannot be said as a matter of law to be guilty of contributory negligence or assumption of risk.

■ It is settled in this jurisdiction that the question of contributory negligence or assumption of risk is not one of law except in the clearest case. McDowall v. Walters, Wyo., 360 P.2d 165, 168, rehearing denied Wyo., 361 P.2d 528; Borzea v. Anselmi, 71 Wyo. 348, 258 P.2d 796, 800; Templar v. Tongate, 71 Wyo. 148, 255 P.2d 223, 231. The facts in this case do not indicate it to be such a case.

■ Generally, the questions as to whether the intoxication or drinking of the operator of an automobile was the proximate cause of injuries received by his guest, and whether the guest knew or should have known the driver was intoxicated are problems for the determination of the jury; and a reviewing court may not interfere with its conclusions when there is substantial evidence to support the findings, as there is in this case. Kroplin v. Huston, 79 Cal.App.2d 332, 179 P.2d 575, 580; Davis v. Hollowell, 326 Mich. 673, 40 N.W. 2d 641, 15 A.L.R.2d 1160; Westergard v. Peterson, 117 Mont. 550, 159 P.2d 518, 520. See Annotation 15 A.L.R.2d 1165.

■ Appellant-Ford claims counsel for plaintiff persisted throughout the course of the trial in conduct violative of well known standards of courtroom decorum. Instances complained of are itemized in appellant's statement of the case. To this accusation appellee counters by citing similar instances of alleged misconduct on the part of counsel for Ford.

Our attention is not directed to any particular objections made during the course of trial where proper corrective measures were not immediately taken by the trial judge. In fact, appellant admits that perhaps no one of the matters referred to in this connection would be sufficient, standing alone, to warrant a reversal. As to whether all of them taken together, without a showing of failure on the part of the judge to correct when requested to do so, would be grounds for reversal, no authority is called to our attention. Here again counsel for appellant admit their research has discovered no case closely similar or analogous.

Under these circumstances, we do not consider there would be sufficient justification for a new trial on account of the alleged misconduct of counsel.

Finding no reversible errors in either the verdict of the jury or the judgment of the court we affirm the judgment entered.

Affirmed.

Mr. Justice GRAY concurring in part and dissenting in part.

## JURISDICTION

I concur with the holding of the majority that the court had jurisdiction of Ford. In this connection the record discloses that from the outset Ford resisted and continues to resist the action here on the ground that as a non-qualified foreign corporation it was not subject to the jurisdiction of the court. The contention presents an important question and in disposing of the matter we first turn to pertinent portions of the record. It appears from the record that the only service of process made upon Ford was personal service of summons upon E. F. Nieman, one of its employees, while the said Nieman was in attendance at the opening of a new Ford agency at Evanston, Wyoming. A timely motion to quash the return of service of summons was filed by Ford on the ground that it is a foreign corporation; owns no property in Wyoming; has not and does not now transact business within this state; and has no agent, officer, or other person here upon whom process can be served.

Attached to the said motion is the affidavit of Nieman, which in substance recites that he is employed by Ford as General Field Manager of the Salt Lake District Sales Office and his assigned duties are promotion of sales of the products of Ford, including therein arrangement for and the handling of relations with independent Ford dealers of Ford products within his district; also, that he is not an officer of Ford and has no duties in connection with claims against Ford.

Counter-affidavits were filed by plaintiff, which in substance set forth that Evanston, Wyoming, is within the area of which Nieman has charge and that on the date in question Nieman was in attendance and carrying out his duties at the grand opening of Aaron Brothers Ford Service, a newly-authorized dealer of Ford products at Evanston, Wyoming. Also present was an assistant to Nieman. Public announcement of the event was made by both Ford and Aaron Brothers.

■ The matter was submitted on said affidavits and after hearing argument thereon the trial court denied the motion. Our task in reviewing the action so taken by the trial court is made difficult by the paucity of the evidence relating to the activities of Ford in this state. This for the reason that mere service of summons upon Nieman within the state did not in and of itself confer jurisdiction upon the trial court. See Long v. Victor Products Corporation, 8 Cir., 297 F.2d 577, 581; Easterling v. Cooper Motors, Inc., D.C.N.C., 26 F.R.D. 1, 2; West Pub. Co. v. Superior Court of City and County of San Francisco, 20 Cal. 2d 720, 128 P.2d 777, certiorari denied 317 U.S. 700, 63 S.Ct. 524, 87 L.Ed. 559; and Minty v. Draper & Company, Inc., D.C. Wyo., 57 F.2d 551, 553. To validate the service it must also appear that Ford, as a foreign corporation, was at the time of service engaging in activities within the state sufficient to make it amenable to jurisdiction of the court from which the process issued.

The problem presented is in two parts. It must first be ascertained whether or not applicable state law means to encompass the challenged service. If this can be answered in the affirmative, then the further question presented is whether or not the state law as applied to the circumstances of the case offends the due process clause of the Federal Constitution. See Lone Star Motor Import, Inc., v. Citroen Cars Corp., 5 Cir., 288 F.2d 69, 72.

■ As has often been said, each case must depend upon its own facts (International Harvester Company v. Commonwealth of Kentucky, 234 U.S. 579, 34 S.Ct. 944, 945, 58 L.Ed. 1479), and the burden rests upon the plaintiff to establish that Ford was doing business in the state at the time service of process was made. See Confidential, Inc. v. Superior Court In and For Los Angeles County, 157 Cal.App.2d 75, 320 P. 2d 546, 549; and Kesler v. Schetky Equipment Corporation, D.C.Cal., 200 F.Supp. 678, 679.

In our approach we prefer first to discuss the limitations of the Federal Constitution laid upon state jurisdiction over a foreign corporation. A myriad of cases and treatises deal with the subject matter (for example see 25 U.Chi.L.Rev. 569; 73 Harv. L.Rev. 909; and 44 Iowa L.Rev. 249); but extensively to review the material would unduly extend this opinion. Suffice it to say that a great evolution in the law has occurred between Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, and the most recent case from the United States Supreme Court of Hanson v. Denckla, 357 U.S. 235, 78 S. Ct. 1228, 2 L.Ed.2d 1283, rehearing denied 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92.

The evolution had its genesis in the classic case of International Shoe Company v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 158, 159, 160, 90 L.Ed. 95. It would therefore seem appropriate to set forth some of the pronouncements of that case. In the course of the opinion it is said:

"Historically the jurisdiction of courts to render judgment in personam is

grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. Pennoyer v. Neff, 95 U.S. 714, 733, 24 L.Ed. 565. But now that the capias ad respondendum has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citations.]

\* \* \* \* \* \*

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. [Citations.] Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations. [Citations.]

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue. [Citations.]"

Clearly old concepts were swept away. A new era dawned for permissive reach of "in personam" jurisdiction by the courts of the states. However, one difficulty with the case is that although it speaks of requisite contacts, ties or relations, and sets forth the factors that were said to establish "minimal contacts" for purposes of the case, it furnished little guide as to how the interplay of those or other factors might rationally be utilized in reaching a sound result under other circumstances. Appellee suggests that McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223, reduced the necessities to activities of a single transaction, but we hardly think this is tenable. In the first instance, it has been said that it did nothing more than to uphold a California statute similar to our own non-resident motor vehicle statute. See Kesler v. Schetky Equipment Corporation, supra. But if McGee v. International Life Insurance Co., supra, did intimate a trend for abolition of state lines in the matter, it was soon dispelled by the more recent case of Hanson v. Denckla, supra. In this case it was said at 78 S.Ct. 1238:

" \* \* \* But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. See Vanderbilt v. Vanderbilt, 354 U.S. 416, 418, 77 S.Ct. 1360, 1362, 1 L.Ed.2d 1456. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a pre-

requisite to its exercise of power over him. * * *"

■ In any event, it seems clear to us that under the pronouncements made there emerges the general rule that so long as the activities of a foreign corporation are sufficiently qualitative in nature and extent reasonably to show "minimal contacts" with the state and state law on the subject is justly construed and applied to reach those activities for jurisdictional purposes under "traditional notions of fair play and substantial justice," all demands of due process are satisfied.

■ With the foregoing concepts in mind, we return to the record made of Ford's activities here. Aided by those matters of which we take judicial notice, it is reasonable to conclude that Ford entered into a dealer relationship with Aaron Brothers of Evanston, Wyoming, for promotion and sale of its products in Wyoming; that such arrangement for all intents and purposes was a continuing one; that the arrangement so made was in keeping with the state-wide practice of Ford for promotion and sale of its products in Wyoming through such dealers; by such arrangement Ford hopes to obtain and does obtain substantial benefits, financial and otherwise; that in pursuit of its business it sends agents and employees into the state to aid and assist its authorized dealers and we would be blinded to actualities to suppose that the activities shown at Evanston, Wyoming, were sporadic and isolated instances of the aggressive marketing practices of Ford in Wyoming; and lastly Ford and its agents and employees while here are protected by the laws of Wyoming.

In conjunction therewith and in disposing of Ford's contention, we have also considered other pertinent factors, such as: the interest of this state in providing a forum for its residents; the relative availability of evidence; the relative burden of defense and prosecution in Wyoming rather than at some other place; the ease of access to some alternative forum; and the extent to which the cause of action arises out of Ford's local activities.

In view of the foregoing and in view of the broadened concept of in personam jurisdiction of the state under the due process clause of the Federal Constitution, it seems clear that the record here was ample to permit the trial court to find and conclude, as it did, that the activities of Ford in this state were, in nature and extent, sufficient to satisfy federal requirements with respect to the matter.

This brings us then to a consideration of the applicable law of Wyoming. The statute involved, § 17–44, W.S.1957, and now superseded by Ch. 85, § 105, S.L. of Wyoming, 1961, provided in essence "That whenever any foreign corporation transacts business in this state without first" qualifying, it shall be amenable to lawful process issuing out of a state court "in any action or proceedings against said foreign corporation growing out of the transaction of any business in this state."

With respect to the jurisdictional question, Ford contends that it was not in fact transacting business here within the meaning of the statute and that under any circumstance plaintiff has failed to meet the burden of proof necessary to sustain jurisdiction.

In disposing of the contention it is necessary first to consider just what was intended as the criteria necessary to establish the transaction of business for purposes of the statute. In this we are not aided by legislative definition, and previous decisions of this court are not particularly helpful.

In State ex rel. Eaton v. Hirst, 53 Wyo. 163, 79 P.2d 489, 496; Chittim v. Belle Fourche Bentonite Products Co., 60 Wyo. 235, 149 P.2d 142, 148; and Creamery Package Manufacturing Co. v. Cheyenne Ice Cream Co., 55 Wyo. 277, 100 P.2d 116, 122, we had occasion to consider the activities that go to establish "doing business" under the non-suit statute. In Creamery Package Manufacturing Co. v. State Board of Equalization, 62 Wyo. 265, 166 P.2d 952,

955, we considered the matter under the Sales and Use Tax Act. But tests applied for purposes of a penal regulatory statute or taxation statutes are of little assistance to the problem of enforcing civil process. See Jarrard Motors Inc. v. Jackson Auto & Supply Co., 237 Miss. 660, 115 So.2d 309.

 Obviously the statute had for its purpose, whenever possible, the furnishing of a local forum to residents of this state who had a grievance against a non-qualified foreign corporation growing out of its business activities here. It seems apparent also that to accomplish its purpose the legislature purposely prescribed a broad standard in order that the statute might receive a reasonable interpretation in keeping with advancements in the law relating thereto and developments in the field of commercial enterprise. In applying the statute such matters are of prime importance. Hoffmeister v. McIntosh, Wyo., 361 P.2d 678, rehearing denied Wyo., 364 P.2d 823.

Also, no citation of authority is necessary to support the proposition that the statute, being remedial, is entitled to a liberal interpretation.

 Actually, the term "transacts business" is not susceptible to determination by application of any hard and fast rule and it is not possible for us to supply a ready formula dispositive of the many complexities that are presented in dealing with the question. It seems clear, however, that the term would not embrace casual, isolated, or sporadic transactions of limited duration and extent but beyond that the matter must be "determined largely according to the facts of each individual case." 20 C.J.S. Corporations § 1920a, p. 151; International Shoe Company v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 159, 90 L.Ed. 95.

We are cited to many cases in the briefs of counsel to sustain their respective positions and certain it is that divergent results have been reached. However, in view of what has already been said, a lengthy discussion of the cases so cited would seem to serve no particular purpose. It is enough to say that such authorities and others have been reviewed and in this regard we think cases such as Cosper v. Smith & Wesson Arms Co., 53 Cal.2d 77, 346 P.2d 409; Regie Nationale des Usines Renault, Billancourt (Seine), France, v. Superior Court In and For Sacramento County, Cal.App., 25 Cal.Rptr. 530, 531; Amphicar Corp. of America v. Gregstad Distributing Corp., Fla.App., 138 So.2d 383, 384, 385; Lone Star Motor Import, Inc. v. Citroen Cars Corp., 5 Cir., 288 F.2d 69, 72; and Jarrard Motors, Inc. v. Jackson Auto & Supply Co., supra, are illlustrative of activities that can reasonably be said to constitute the transaction of business within a state. Of course, Ford's activities here as above related differ to some extent from the activities shown in the foregoing cases but nevertheless there is substantial similarity in many respects.

Were we to conclude that the statute before us was so restrictive that it failed to impose jurisdiction over a foreign corporation that engages here in activities of the quality and extent shown on the part of Ford, we think we would do violence to the plain intent and purpose of the statute. In fact, we find nothing in the statute that indicates a purpose other than to assert jurisdiction over a non-qualified corporation to the extent authorized by the due process clause.

For the reasons stated we agree with the trial court that a reasonable and just interpretation of the statute, when applied to Ford's activities within this state, brought Ford within its reach for jurisdictional purposes and inasmuch as plaintiff's complaint was based upon a local incident growing out of those activities, the trial court was fully warranted in asserting its jurisdiction.

Ford further insists that even though we conclude that it was subject to the jurisdiction of the trial court, it was never properly served with summons. The contention is bottomed upon the further provisions of § 17–44, W.S.1957, that relate to service of process. In substance the statute provides under circumstances here that service may

be made by leaving a copy of the summons with the secretary of state and the mailing of a notice of such service and copy of the process by registered mail to the defendant corporation or that service of process may be made by delivery thereof to the corporation outside the state.

The foregoing statute was enacted in the year 1929. Subsequent to that time we adopted Wyoming Rules of Civil Procedure and Rule 4(d) (4) thereof provides in part:

"Upon a corporation, by delivery of copies to any officer, manager, general agent, or agent for process. If no such officer, manager or agent can be found in the county in which the action is brought such copies may be delivered to any agent or employee found in such county. * * * *"

It will be noticed that this substantially departs from Rule 4(d) (3) of the Federal Rules, from which our rules were taken. The return here shows that there was no officer, manager, general agent, or agent for process found in Wyoming and that as a consequence service was made on Nieman, an agent or employee who was found in Uinta County. With respect to Nieman, the trial court on the evidence before it was entitled to find and apparently did find that even though Nieman was not authorized by Ford to accept service, his position of responsibility was such that the process served upon him reasonably afforded opportunity to Ford to defend in the action.

■■ We think the method of service set forth in the statute is not exclusive and that the method provided by our rules must be considered in conjunction with and cumulative of the method of service upon non-qualified foreign corporations. Toedman v. Nooter Corporation, 180 Kan. 703, 308 P.2d 138, 143.

Ford relies principally upon Fletcher, Cyclopedia of Corporations (Perm.Ed.), and upon Goodman v. Leitman, 20 Misc.2d 549, 194 N.Y.S.2d 561, but those authorities do not seem apropos. As we pointed out, the provision of the rules is cumulative and

therefore may be utilized and such alternative method apparently was not present or considered in the authorities cited.

■■■ Due process requires only that the representative served be a responsible representative of the foreign corporation. Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 418, 96 L.Ed. 485, rehearing denied 343 U.S. 917, 72 S.Ct. 645, 96 L.Ed. 1332.

## THE MERITS OF THE CASE

With respect to the question of whether or not the verdict and judgment against Ford can be sustained on the record made, I agree with the majority that the expert testimony offered to establish negligence on the part of Ford was sufficient to warrant submission to the jury of the issue of negligence. I am unable to agree, however, that the record discloses substantial evidence sufficient to warrant the inference that the negligence of Ford was an efficient concurrent cause of injury to plaintiff.

To point up the basis for my difficulty in accepting the views of the majority it is necessary for me to set forth additional matters appearing of record.

In this litigation plaintiff undertook a difficult and exacting task. To succeed in his theory of joint liability it was necessary to establish gross negligence on the part of Peterson in causing the car to leave the highway and upset. To recover against Ford he had to prove that despite the gross negligence of Peterson the negligence of Ford was an efficient concurrent cause to the upset. This for the reason that it was incumbent upon plaintiff to show that his injury "would not have resulted in the absence of either" cause. Checker Yellow Cab. Co. v. Shiflett, Wyo., 351 P.2d 660, 667.

To accomplish his purpose he charges in his complaint, among other things, that Peterson's negligence consisted of driving the car at an unlawful, dangerous and excessive rate of speed in a "zigzag" course upon the highway; that he operated the car in this fashion when he knew it was unsafe; and that he was under the in-

fluence of intoxicating liquor and was intoxicated. Those charges were never withdrawn or modified in any way by plaintiff. As will be seen, I attach particular significance to those charges for the reason that Ford, in its answer, admitted such gross negligence on the part of Peterson.

The charge of negligence against Ford was that the wheel was defectively manufactured and as a result the wheel broke while the car was being driven by Peterson, causing the wreck. Nothing was alleged concerning a flat tire. Ford denied the charge.

Of significance here also is the fact that Peterson in his answer denied the charges of plaintiff and set up a cross-claim against Ford for damages to his car and damages to his person, claiming negligence on the part of Ford in the manufacture of the wheel. He alleged that the defect in the right-front wheel from such negligence, through no fault of his, caused the wheel of the automobile to become "broken and detached therefrom just as he was entering an 'S' curve, by reason of which he was unable to manage, control or turn said vehicle which plunged off the highway and off the travelled portion of the road, colliding forcefully with the barrow pit and an irrigation ditch adjoining said highway with great force and violence." At the conclusion of the evidence the trial court directed a verdict in favor of Ford against Peterson.

Turning to the evidence, the large "S" curve on the highway mentioned by the majority was approximately one mile distant from the bar where the unfortunate venture commenced. The first turn on the "S" curve was a right-hand turn. The second turn on the "S" curve was a left-hand turn some one-quarter of a mile distant from the right-hand turn. Right here I think it appropriate to mention that Peterson, from the time he purchased this car new in October 1957, had trouble in controlling the car. He said it was inclined to pull to the right; that "it kept drifting off to the right"; that he had trouble on "twis-ty, turny roads"; and particularly on a left-hand curve it would pull to the right. Because of this he had never driven the car over 65 miles per hour prior to the accident. The negligence of Ford was not shown in any way to be connected with this difficulty and the evidence shows that Peterson on the evening of the accident telephoned from the bar to make arrangements with the dealer to inspect and service the car.

Upon leaving the bar, Peterson, with an open can of beer in his hands, got into the driver's seat. Hoopes sat next to him and plaintiff sat next to Hoopes. Peterson immediately accelerated the car and just before they got into the right-hand turn of the "S" curve Hoopes looked at the speedometer and Peterson was driving approximately 85 miles per hour. He remonstrated but Peterson said he would do the driving. After they were out of the first turn and were proceeding toward the left-hand turn of the "S" curve, plaintiff looked at the speedometer and Peterson was still driving 85 miles per hour. He also remonstrated but again Peterson said he would do the driving and plaintiff then shouted something like "let me out" or "look out." Neither Hoopes nor plaintiff testified that Peterson reduced his speed in the least despite their protests.

To develop a little further the state of the record before us as I understand it, plaintiff's efforts now to reduce Peterson's condition from one of intoxication to a "relaxed" condition are not open to him. On the basis of the pleadings the issue of Peterson's intoxication was settled as between plaintiff and Ford. There was no such issue to be passed upon by the jury. True, with the indulgence of the court as against Ford, he could introduce evidence of the circumstances with respect to the intoxication (see 53 Am.Jur., Trial, § 105; and 9 Wigmore on Evidence, § 2591, p. 589 (3d Ed.)) but "Having stated his position in the pleadings, he cannot alter it at this time." Dame v. Mileski, 80 Wyo. 156, 340 P.2d 205, 209; see also Board of County Commissioners of County of Fremont v.

State ex rel. Miller, Wyo., 369 P.2d 537, 540.

In Kerr-McGee Oil Industries, Inc. v. McCray, 89 Ariz. 307, 361 P.2d 734, 736, it is said:

" * * * No citation of authority is needed for the proposition that facts admitted in the pleadings will be accepted as true both here and in the court below."

In Alberts v. American Casualty Co. of Reading, Pa., 88 Cal.App.2d 891, 200 P.2d 37, 40, it is said:

" * * * The allegations of the complaint admitted by the answer are treated as an admitted fact on appeal. [Citation.]"

In Lifton v. Harshman, 80 Cal.App.2d 422, 182 P.2d 222, 228, it is stated:

"When allegations in a complaint are admitted by the answer (a) no evidence need be offered in their support; (b) evidence is not admissible to prove their untruth; (c) no finding thereon is necessary; (d) a finding contrary thereto is error."

See also Fidelity Finance Co. v. Westfall, 127 Neb. 56, 254 N.W. 710, 711; Lutz v. Frick Company, 242 Ind. 599, 181 N.E.2d 14, 15; Precision Extrusions, Inc. v. Stewart, 36 Ill.App.2d 30, 183 N.E.2d 547, 556; Hill v. Federal Trade Commission, 5 Cir., 124 F.2d 104, 106; Edmonston v. Holder, 203 Okl. 189, 218 P.2d 905, 909; and 71 C.J.S. Pleading § 59, p. 150.

The same thing is true of plaintiff's efforts here to reduce the speed of the car substantially below 85 miles per hour. Plaintiff's testimony concerning the speed was not made on the basis of an estimate but from actual observation of the speedometer. Having so testified he is bound by it and he will not be heard here to say that this car was not traveling at that speed when it came out of the first turn. Chicago, B. & Q. R. Co. v. McPhillamey, 19 Wyo. 425, 118 P. 682, 686.

In the light of the foregoing it seems at least probable that this accident was inevitable without contribution of Ford. To avoid the accident Peterson of necessity had to pull this car to the left upon coming out of the right-hand turn of the "S" curve and approaching the left-hand turn. His ability to meet this demand was obviously affected by the inclination of the car to drift and pull to the right and particularly on a left-hand curve; by his intoxication; by his speed and driving in a "zigzag" course; by his irritation and distraction from the remonstrances of his companions; and by the open can of beer either in his hand or between his legs. These facts, standing alone, are such that to me no reasonable jury could find that this accident would not have happened but for the negligence of Ford.

Of course, it is true that Peterson's extraordinary version of the affair, accepted by the jury, that a rivet "popped" out of its hole and caused a flat tire which in turn affected his driving is within the realm of possibility. However, there is no evidence in this record that I can find which would permit the jury to adopt Peterson's version as more probable than the version that this accident was inevitable, in any event, through Peterson's negligence alone. Under those circumstances the verdict cannot stand.

Many years ago in Hartung v. Union Pac. R. Co., 35 Wyo. 188, 247 P. 1071, 1073, we said:

" * * * Two or more possible theories might be adopted to explain the death of the decedent. But there is no evidence in the case that would authorize us to adopt one in preference of another. And it is well established that, where two inferences may be deduced, one of which authorizes recovery and the other not, and both inferences are equally reasonable, the inferences meet and destroy each other; neither has any probative force, and one cannot be arbitrarily chosen in preference of the other. * * *"

See also Northwest States Utilities Co. v. Ashton, 51 Wyo. 168, 65 P.2d 235, 238, re-

hearing denied Northwest States Utilities Co. v. Brouilette, 51 Wyo. 132, 65 P.2d 223, 69 P.2d 623; White v. Maverick Production Co., 63 Wyo. 452, 182 P.2d 818, 822; General Motors Corporation v. Wolverine Insurance Company, 6 Cir., 255 F.2d 8, 9; and Price v. Ashby's Incorporated, 11 Utah 2d 54, 354 P.2d 1064, 1065.

But should I be mistaken in this view, I still cannot agree that the verdict against Ford can be sustained. The majority view is bottomed on Peterson's supposititious statement that he figured "it must be a flat tire" or felt like a flat tire that caused him to lose control of the car with the result that the car left the highway. Unlike my associates, I can find no corroboration of Peterson's nebulous statements concerning the tire and as a result I have difficulty in accepting those statements, even though believed by the jury, as sufficient substantial evidence to sustain the verdict.

In the first instance, in the light of common experience, how often have all of us in driving down the highway "felt" as if we had a flat tire only to discover on investigation that such tire was fully inflated?

Secondly, while I agree to the general proposition that the credibility of Peterson was for the jury, that does not relieve us of reviewing the entire record and "analyzing the evidence in the light of reason and human experience and giving consideration to the motives and propensities which tend to influence or prompt human action." Montgomery Ward & Co. v. Arbogast, 53 Wyo. 275, 81 P.2d 885, 892. Here Peterson was vitally interested in the outcome of this litigation. In fact, he actively participated in providing expert testimony for plaintiff. His version concerning the tire was entirely at variance with the version under his own pleadings and he was actually impeached in this regard. In addition, I think the record shows his testimony was inherently improbable.

We have in the past refused to accept the testimony of a witness as sufficient to sustain a finding when an interested witness failed to testify in a direct and positive manner (In re Stringer's Estate, 80 Wyo. 389, 343 P.2d 508, 519, rehearing denied 80 Wyo. 389, 345 P.2d 786); when contrary to previous-sworn statements (Washakie Livestock Loan Co. v. Meigh, 50 Wyo. 480, 62 P.2d 523, 526, 107 A.L.R. 1063); and when inherently improbable (Montgomery Ward & Co., supra; and Steadman v. Topham, 80 Wyo. 63, 338 P.2d 820, 825).

The one important piece of physical evidence here is the tire itself. That tire was undamaged. According to the uncontradicted testimony of the witness Stilley, a representative of the manufacturer of the tire, it is hardly to be expected that this tire, if flat, could undergo the full weight of the car on impact and not show some damage.

Also, to me, it is hardly to be supposed that if Peterson's difficulty were a flat tire he would have said nothing to plaintiff and Hoopes about it at the time the car started to pull off the highway or immediately thereafter and would have so responded to plaintiff's inquiry about "too much Adolph Coors."

Thus, without corroboration from other witnesses or the physical facts of Peterson's extraordinary version of the manner in which Ford's negligence became an efficient concurrent cause in his loss of control of the car, I feel constrained to say that it is not of sufficient probative force to constitute the substantial evidence necessary to sustain the verdict.

I would reverse the judgment with direction to dismiss the complaint.