**Bard.TERRY, d/b/a Terry Drilling Co.,
Appellant (Defendant below),**

v.

**J. R. MOORE, Appellee (Plaintiff below).**

No. 3702.

Supreme Court of Wyoming.

Dec. 31, 1968.

Robert L. Duncan, Cheyenne, for appellant.

A. G. McClintock, of McClintock, Mai & Urbigkit, Cheyenne, for appellee.

Before HARNSBERGER, C. J., and GRAY, McINTYRE and PARKER, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

Well-drilling contractor Bard Terry drilled a water well for rancher J. R. Moore. Sand came into the well and choked off the water several months later. Moore sued and obtained judgment in the district court against Terry for damages in the amount of $1,538.10, which was the full amount paid by Moore for drilling of the well and for the cost of the casing, pump and equipment. Terry has appealed.

In his complaint Moore claimed the right to recover on two theories. First, on the theory of a guarantee, and second, on the theory of negligence on the part of Terry in drilling and completing the well.

Moore had been a long time resident of the Albin area where his ranch was, and the well was to be drilled on his ranch. He knew a lot about the problems of water wells in that locality. In consequence, when he approached Terry about drilling the well, he explained that in his vicinity "we got a fine sand and it is fine, just about as fine as your water." As a matter of fact, Moore's existing well, which was some 200 or 300 feet from the site chosen for a new well, was having troubles on account of this sand, and that seemed to be the reason for wanting well number 2 drilled.

Terry submitted a written estimate for the cost of a well based on information given him by Moore. The parties orally

agreed on terms, and Terry drilled. Moore's testimony indicates water was found in the sand formation. He said Terry got into the sand and it ran in about as fast as he was drilling, and he was not making much headway. In particular Moore testified, "and that was when he got down to 255 feet I believe is what he was supposed to have went."

We mention 255 feet, which was the total depth of the well drilled, because there has been some suggestion on the part of Moore that maybe Terry should have gone deeper and tried to find water in a different and less troublesome formation. However, there never was a contract for a well at a greater depth or in a different formation; there were never any instructions from Moore to drill deeper; Moore acquiesced, if he did not in fact direct, that the well should be completed where it was completed; and he accepted and paid for the well so completed.

In any event, there was no testimony to indicate that water would have been discovered at a greater depth, or that water is known to exist in the Albin area at another level. It would be only a speculation to conjecture that a more successful well could have been completed at some other depth. But we need not dwell further on the possibility suggested by Moore. His attorney has admitted in oral argument that he does not claim Terry was negligent by not going deeper.

Actually, we have digressed to speak of Moore's suggestion that maybe Terry should have gone deeper because it denotes an apparent attitude in this case to make Terry a guarantor, even if he did not specifically guarantee a satisfactory well for an indefinite period of time.

### Was There a Warranty?

Moore admitted on the witness stand he did not ask Terry to guarantee there would be a certain flowage of water from the well. His attorney likewise stated in oral argument there is no claim of a warranty at the beginning. However, the attorney does claim, when Terry reached the well's total depth, he said it would produce 400 gallons of water per hour continuously. It is argued this was a guarantee which Terry can be held to.

The transcript of evidence shows Terry made a pump test of the well, running open discharge 24 hours a day for several days. The result of the test was noted on the well log which Terry kept, in these words: "Well will produce over 400 G.P.H. continuously." From this, counsel for appellee-Moore argues there was a guarantee this well would produce that much water forever.

The only authorities cited by appellee for his contention relative to a warranty are § 34–2–313, W.S.1957, 1967 Cum.Supp.; and Nielson v. Hermansen, 109 Utah 180, 166 P.2d 536, 537. The statute referred to states, any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes *part of the basis of the bargain* creates an express warranty that the goods will conform to the affirmation or promise. The Utah case cited states, a representation of fact which would naturally tend to and does *induce a bargain* is a warranty.

■ Counsel seems to overlook that, regardless of what Terry may have said or written about 400 gallons of water per hour, it was not a part of the basis of the bargain, neither did it induce a bargain. The parties had their bargain and contract before the well was started. No new bargain or contract was made when the test was run. Counsel suggests the statement was intended to induce payment for the well, but Moore had already bargained and promised to pay for the well.

In any event, we construe the statement concerning 400 gallons per hour to relate only to the volume of water and not to what might or might not happen to equipment or to the productive formation in the future. The testimony throughout the record shows an abundance of water. As a matter of fact, it is apparent there was

much too much water for the kind of formation it was in.

Plaintiff's witnesses stated many times there was plenty of water and "no limit to the water." One expert witness for plaintiff told of bailing operations and getting 20 gallons per minute, which would far exceed 400 gallons per hour. Moore's grandson, who farmed Moore's place, testified for five or six months the well was "real good."

But aside from our reasons for believing no warranty was made by Terry, the trial judge, who tried this case without a jury, found "the evidence shows that the well was improperly drilled by defendant, was unusable, and that plaintiff should recover the amount paid to defendant." There was no finding that a guarantee had been given by defendant.

We are not triers or finders of fact, and in the absence of something to indicate that the trial judge may have found a warranty to have been given, we will not approve the judgment on the basis of a warranty.

### Negligence

When Moore's grandson started having real trouble with sand plugging the well, he got in touch with Terry. Several times Terry went out and bailed out the sand and did what he could to make the well produce properly. At first, it would produce good again for a limited time. Finally, it got to the point that Terry could do no more with it, and he quit trying.

It was known and is admitted that Terry used a "gravel pack" in finishing the well. This means he put gravel in the well hole, but outside of the casing, in sufficient quantity to fill the annulus from the bottom up through all of the sand formation.

It is undisputed that two and one-half cubic yards of gravel were used for this purpose. Our calculations of volume show that amount of gravel would fill approximately 218 feet of the annulus. The purpose of the gravel is to serve as a screen in keeping sand from going through perforations in the casing, as much as possible.

When Terry was unable to correct the sand problem which developed some five or six months after completion of the well, Moore got a drilling contractor, Orville Haug, from Bushnell, Nebraska, to see what he could do with the well. At the trial, Haug testified he simply could not overcome the sand. At first he could only get to about 232 feet by bailing. He then "pressured up," apparently backwashing, after which he was able to get to the bottom.

Typical of Haug's testimony was the following:

"When I bailed it out I couldn't get the sand shut off. Come in from two hundred two feet to two hundred thirty-two feet and I was bailing out. I know I didn't have gravel pack because it run in there faster than I could bail out. And I was making a trip a minute and I was losing hole right along. Plenty of water and mostly sand and I knew I didn't have no gravel pack there and that was why I don't think the gravel pack went down."

Concerning the volume of sand bailed by Haug, Moore testified Haug got out sand, piled up "that" high; it still come in. We have no way of knowing how high "that" high was, but the overall inference from all the testimony is that huge quantities of sand were bailed out after the well went bad, both by Terry and by Haug.

It was admitted by both Moore and his grandson on the witness stand that Terry used a gravel pack. It was also admitted by Moore's attorney in oral argument. Their contention is that for some reason the gravel pack did not go down far enough in the well to screen the perforations. The only possible claim of negligence plaintiff has to stand on is that this gravel pack did not go down and that Terry was negligent in connection with the pack not going down.

Crucial on this point is the testimony of Haug because his opinion that the gravel pack did not go down is the only evidence plaintiff can rely on for proof of negli-

gence. The pertinent part of his testimony on this matter was the following:

"Q. Why was it not possible for you to get this particular well into steady production? A. Well, just couldn't overcome the sand. I didn't have no gravel. Looked to me like the gravel didn't go down all the way and we pressured it up and tried everything. Tried to get a gravel pack to drop it and wouldn't do it.

"Q. Do you have an opinion as to whether, from your observation whether the gravel pack went clear to the bottom of the well? A. Yes. Myself I don't think it did.

"Q. What facts do you base your conclusion? A. You could pull the well and should be able to pull the well, put in your gravel and if it wouldn't go down there, you would shut it off and back off."

Although Haug failed to answer the question as to what facts he based his conclusion on, it is apparent from his testimony as a whole that he based it on the fact that he never detected gravel in any of the sand he bailed out. While he never gave it as a reason for his opinion, we can imagine his opinion was formed partly from the fact the gravel was not adequately screening out the sand, at the time of his operations.

We have reason to believe the physical facts in this case belie both the opinion of Haug that the gravel pack did not go down and also the basis for his opinion. Before discussing such physical facts, however, we wish to say, even if we accepted Haug's opinion as being well founded, his testimony still would not constitute evidence of negligence on the part of Terry. We need to elaborate on this to some extent.

There is no evidence that Terry did anything wrong, or failed to do anything he should have done, which would have changed the result. For example, no one said the gravel was too coarse or too fine. It was described as fine gravel running three-sixteenths to three-eighths inch. One of

the physical facts could be that such gravel should have gone to the bottom of the hole where the hole drilled was ten inches in diameter and the casing was six inches (inside diameter).

As near as we have been able to observe from all of Haug's testimony, he would have drilled and completed the well substantially as Terry did. At least he did not point out any different methods or procedures which a careful driller should have followed or which would have been better.

The following from the cross-examination of Haug would seem to indicate affirmative approval rather than condemnation of Terry and his methods:

"Q. So that could be beyond the control of the driller? A. Well, I don't know how Mr. Terry completes his wells. I know how I complete my wells when I drill them. Every driller has his own business.

"Q. But Mr. Terry is acceptable as far as the business is concerned? A. Yes."

As far as Terry is concerned, he described his installation of the gravel pack in this manner:

"Q. How much gravel was brought in? A. Two and one-half yards.

"Q. What did you do with that? A. This was dropped along the sides of the casing and as you bail out the center of the casing the gravel goes down the outside. And when you get gravel to the bottom of the well you lose sight of the gravel. That would turn the casing loose and make a good tight seal.

"Q. Did you do this? A. Yes."

No testimony or other evidence disputed or contradicted what Terry said regarding his placing of the gravel pack, and no witness suggested that anything different should have been done. Even if it were assumed, because of Haug's opinion, that the gravel pack did not go down when Terry completed the well, there would still be the question of whether he should have detected it and whether he could have caused it to go down.

If the gravel bridged over in the annulus before it got to the bottom, Haug as well as Terry should have been able to unbridge it. There is nothing in the evidence to suggest Terry had a better opportunity to accomplish such a result than did Haug. We have previously indicated Terry was not an insurer or guarantor. He cannot be held for something beyond his control.

Let us take time at this point to demonstrate how little Haug and Moore believed a better job of completion was possible in the formation Terry was dealing with, at the site of Moore's number 2 well. Concerning the kind of formation here present, Haug stated: "I myself, I case it out and hunt for something else."

Also, according to Haug, he and Moore discussed whether a new well (number 3) should be drilled or whether they should try to make the original well (number 1) usable. Haug told Moore he was done with the Terry well; he had done everything he could; and it was just costing Moore money and Haug was wasting his time. The decision was to try to restore the original (number 1) well and not drill a new one.

The judgment in this case has the effect of requiring Terry to pay for a new (number 3) well. If somebody first proved a new well could be drilled and completed with better results than Terry got, at the site and in the sand formation Terry dealt with, there might be some basis for believing Terry could have done better.

■ As things now stand, there is no reason to believe Terry or anyone else could have done better in the sand formation which existed at the number 2 well site. At least Haug and Moore, even with all of the knowledge and information gained from the experiences of the Terry well, decided it was not practical to try a third well.

### Physical Facts

Aside from the fact there is a total absence of evidence tending to show Terry did any particular thing wrong or in a negligent manner, or that he failed to do anything he could have done and should have done, we have indicated physical facts in the case belie the basis of Haug's opinion that Terry's gravel pack did not go where it was supposed to go.

■ In Oeland v. Neuman Transit Company, Wyo., 365 P.2d 806, 810, reh. den. 367 P.2d 967, we cited much authority for and relied upon the rule that, where evidence is contrary to physical facts, a judgment based thereon should not be sustained. It follows, a fortiori, the rule would particularly apply where the evidence in question is merely the expression of an opinion by a witness and not testimony as to facts observed or known to exist.

The first physical fact known and undisputed is that Terry's completion gave very good satisfaction and resulted in a "real good" well for some five or six months. The most plausible inference to be drawn from this undisputed and admitted fact is that Terry did a reasonably good job in drilling and completing the well; but that conditions in the formation itself changed subsequent to the completion.

We have previously mentioned that the gravel ranged from three-sixteenths to three-eighths inch in size. With a ten-inch hole and casing six inches in inside diameter, it is a physical fact the gravel should have gone down without bridging.

It is undisputed two and one-half cubic yards of gravel were used for the gravel pack, and as Terry described the finish, he lost sight of the gravel when it went to the bottom. Apparently none of the parties or attorneys calculated how much hole would be filled with the amount of gravel used, but we have. It would be approximately 218 feet, or all but 37 feet of the hole. If the gravel did indeed go out of sight, it becomes fairly certain it went the last 37 feet.

Moreover, Haug used water pressure down the inside of the casing and out into the annulus in an effort to dislodge what he conceived to be bridging of the gravel in the annulus. If the gravel filled all but

about 37 feet of the annulus, and if the gravel was out of sight on top, the bridging would have to be in the lower few feet. This would be where perforations were because the lower 55 feet were perforated.

It thus becomes a fairly conclusive physical fact that the backward water pressure would have freed the gravel if bridged within the perforation zone. It should have freed the gravel if bridged at any other point in the annulus. Haug thought, with all he did, he should have been able to free what he conceived to be a bridging of the gravel above the water zone. When asked why he could not so do, his answer was "I don't know."

Here again, the most plausible inference is that the gravel went all the way down when it was originally put in the annulus. Haug's opinion that it did not do so overlooks the most obvious physical fact of all —the immense quantities of sand that were displaced in the formation and bailed out by both Terry and Haug in an effort to rework the well.

It is common knowledge that water increases in velocity as it gets closer and closer to the well which is the center of its production area. Thus it carries more and more sand through the gravel screen and into the well. Remember the thickness of the gravel screen would be only about one and one-half inches to begin with, being the distance between the outside of the casing and the wall of the well.

When large amounts of fine sand are carried out of the formation, it can only leave large voids in the formation. The gravel then cannot help sloughing away from the casing and into these voids.

Haug gave credence to this sort of thing in his testimony. He was asked about the well producing several months and if that would not show there was a gravel pack in the well. He admitted a lot of things happen underground and said, "You could have had a blow off down there and gravel —quicksand with pressure of water in the hole, gravel moved down."

Of course, there was no evidence of a blowoff, but removal of large quantities of the formation with the inevitable voids it would leave could only produce the same effect. It is to be remembered too that Terry did a lot of work with much bailing, in an effort to restore the well, before Haug began.

We do not know the width of the perforations and whether any of the gravel could have entered into the casing. Particles of gravel left in place against the casing and small enough to go through the perforations could very well have gone through and been bailed out before Haug began.

Another physical fact not taken into account by Haug is worth mentioning. With the kind of emptiness and voidness which would exist in the fine sand formation, after large amounts of sand have been displaced and bailed out, it becomes evident Haug's reverse pressure washing could only drive gravel farther away from the casing and into the sand. In other words, Haug's theory assumes the walls of the well, at the time of his operations were reasonably solid such as they would be through formations like clay and other impermeable compositions. There doubtless were at that time no walls left in the sand formation opposite the casing perforations.

In the absence of any substantial testimony tending to say Terry's procedures were wrong or negligent, and in the face of the physical facts we have pointed out, which contradict the basis for Haug's opinion that gravel put in by Terry did not reach its intended destination, there would be no basis for holding Terry liable without making him an insurer or guarantor, which he was not. Judgment should have been for defendant Terry.

Reversed.